[No. S089623. July 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
LESTER HARLAND WILSON, Defendant and Appellant.

768

## COUNSEL

Patrick Morgan Ford, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—A jury in Riverside County Superior Court convicted Lester Harland Wilson in 2000 of the first degree murder of Uwe Durbin (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated) and of having personally used a firearm in the commission of the murder (§ 12022.5). It also convicted him of two counts of forcible rape (§ 261, subd. (a)(2)) and sustained two allegations that he used a firearm while committing these latter crimes (§ 12022.5). The jury also sustained special circumstance allegations that Wilson committed the murder while engaged in the commission of a kidnapping (§ 190.2, subd. (a)(17)(B)) and that the murder involved the intentional infliction of torture (*id.*, subd. (a)(18)). On March 14, 2000, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment of guilt but, as explained below, the erroneous excusal during the penalty phase deliberations of the sole juror holding out for a life sentence requires that we reverse the penalty judgment.

## I. Guilt Phase Facts

### A. *Prelude*

Defendant Lester Wilson lived in Riverside with his wife, codefendant Barbara Phillips.[1] On June 8, 1997, a realtor arrived at defendant's home for a prearranged visit and, noticing the back door was open, suspected a burglary had been committed. He called defendant and Phillips to alert them. The pair arrived home and found two televisions and a videocassette recorder (VCR) were missing. A few weeks earlier, defendant had allowed Uwe Durbin, a recovering drug addict, to stay with them. Defendant believed Durbin was responsible for the theft because he had stolen from defendant before. Enraged by the thefts, defendant grabbed a gun and left the house with Phillips and his two pit bulls. The realtor was sufficiently disturbed by these events that he noted defendant's license plate number and called 911, informing the dispatcher that defendant had a gun and was "a little irate."

### B. *Kidnapping*

In an attempt to find Uwe Durbin, defendant and Phillips went to the home of Uwe's brother, Michael Durbin. Michael lived with his girlfriend, L.R., and their three young children. When Michael answered the front door around 10:00 a.m., he was met by defendant pointing a gun at his head. Defendant was screaming about some missing property; he then pulled the telephone cord from the wall and demanded to know where he could find Uwe. Although L.R. and her children initially hid in the bedroom, Phillips found them. Defendant entered the bedroom and told L.R. that she must follow his instructions or he would kill her and her children. After 10 to 15 minutes, defendant told them they were all leaving with him and Phillips to go look for Uwe. Michael drove his car with defendant; Phillips drove her car with L.R. and the children.

As they left Michael's apartment, they saw Uwe walking on the street toward his brother's house. Defendant forced him into one of the cars at gunpoint. Defendant demanded his property, but Uwe professed ignorance about the theft. The group drove to several houses looking for the missing property but were unsuccessful. Phillips suggested to defendant that they take all six victims to their home, and he agreed.

---

[1] Phillips was tried jointly with defendant, but with a separate jury, and convicted of first degree murder with kidnapping and torture special circumstances and a finding of personal gun use. The district attorney apparently did not seek the death penalty for her, and she was sentenced to life imprisonment without possibility of parole.

### C. *Wounding and Beating*

Once they arrived at defendant and Phillips's house, defendant continued to wield the gun and demand his property. When he received no satisfactory answers, he turned the radio to a very high volume and shot Uwe in the kneecap. Uwe moaned, and Michael stood up to protest but sat down again when defendant pointed the gun at him. Michael asked that L.R. and the children be released, but defendant refused.

Defendant dragged Uwe downstairs and bound him to a chair with duct tape and rope. Defendant placed two D-cell batteries inside a gardener's glove and beat Uwe with it, hitting him in the head about 10 times. During this beating, defendant was yelling: "Where's my TV and VCR?" In the meantime, Phillips was in the living room demanding the return of their property from Michael, who repeated his plea that L.R. and the children be freed. Phillips told him no one would be leaving and that they were all going to die.

After this beating, Uwe asked for some paper to write down directions to a location where defendant could find his property. Defendant and Michael left the house with the directions, while Phillips guarded the others. Uwe's directions turned out to be bogus, and defendant and Michael returned to the house, although defendant left again thereafter. At this time, Uwe was still bound to a chair, and Phillips was guarding Michael, L.R. and the children.

### D. *Torture*

Defendant went to Nicole Thompson's house. Present at the house were Thompson, Nathan McCullah, and codefendants Norman "Baby-G" Culpepper, Charone "Ron-Ron" Parker and Michael "K-Mack" Woods. Defendant told them he had shot someone, planned to kill him, and needed some gauze. They had none, so defendant returned to his house, accompanied by Culpepper, Parker and Woods. Michael was in the living room, holding a Bible. Parker said he had better read the Bible because they were all going to die. The men laid some plastic sheeting on the floor of the downstairs bedroom to prevent Uwe's blood from staining the carpet, rolled Uwe onto it, and began hitting and kicking him. They also used the batteries in the glove to beat him. Uwe screamed each time he was struck. This went on for about an hour; Michael and his family heard the victim crying, screaming and moaning.

Eventually, defendant forced Michael into the bedroom where they had been beating Uwe. There was blood all over the room. The men used duct tape to bind Michael to a chair and forced him to view his brother's body. Uwe's eyes were swollen shut. Defendant tried to have one of his pit bulls

attack Uwe, but the dog refused. Defendant struck the dog and then choked Uwe with a dog chain until he gasped for air. When Uwe told defendant where his property could be found, defendant, Culpepper and Parker left to find it. They returned about an hour later having recovered a television and a VCR, which they put in the living room.

### E. *The First Rape*

During the time the men were beating Uwe, Phillips moved L.R. and her children in and out of the house several times. Nicole Thompson, who by that time had joined the others at defendant's house, took L.R. and the children first to a public park and then to her own house, where she intended to release them. Shortly after she returned home, however, defendant arrived with some of the others. Defendant told L.R. they were going to take a ride around the block. Parker told him he did not "need to do that," but defendant said he needed to make L.R. "understand."

Defendant drove L.R. to a park; her six-month-old baby was in the backseat. He asked her how she could prove to him she would not speak to the police if they let her go. She did not understand what he meant. He then told her to take off her pants. She complied out of fear. He then had intercourse with her against her will, believing the act would ensure she would not talk to the police. They returned to Thompson's house, picked up the others, and they all returned to defendant's house.

### F. *Resumption of Torture*

Upon returning to his house, either defendant or one of the others untied Michael and allowed him out of the bedroom. Michael asked defendant and Phillips to release them, but they refused. Phillips said they were going to kill Uwe. Michael heard the men beating Uwe again; defendant participated in this beating. At one point Michael heard breaking glass. Uwe asked for something to drink; Woods suggested they urinate into a cup and force Uwe to drink it. Defendant and Woods emerged from the bathroom with a cup of urine; Uwe did not drink it all so the men beat him for several minutes before forcing him to drink a second cup of urine. Phillips was yelling: "He did this" and "We're going to kill him."

Michael saw bottles of alcoholic beverages and believed the men were drinking and enjoying themselves. At one point, Michael saw Culpepper emerge from the bedroom with a weight from a barbell set. The weight, which was about as wide as a dinner plate, had blood on it. Culpepper's clothes were bloody and soaked in sweat. L.R. heard the sound of a blowtorch coming out of the bedroom. At one point, Michael believed someone poured bleach on Uwe's wounds.

### G. *The Second Rape and Escape*

Phillips took Michael out of the house on an errand. After they left, defendant isolated L.R. in the dining room and told her he wanted to have sex again. He bent her over the table and raped her. Defendant told her he was not concerned about Phillips returning and surprising them because she did not have a key to the house. L.R.'s fingerprints were found on the table in a location tending to corroborate her account. L.R. testified she complied out of fear.

After this second rape, defendant forced L.R. to help him move Uwe out of the bedroom. At this point, Uwe was wrapped in some plastic sheeting. L.R. opted to carry Uwe by the feet because she did not want to look at his face, which was "messed up," but he was too heavy for her. When Phillips returned with Michael, he took over for his girlfriend because she was crying. Michael helped move Uwe to defendant's car. Uwe was still alive at this time. Defendant and Michael placed Uwe on a plastic sheet in the car; defendant threw an additional sheet on top of him.

Meanwhile, Phillips forced L.R. to rub ice on the carpet in an attempt to remove the bloodstains. Blood was evident on both the carpet and the walls. Some of Uwe's hair was also on the walls. Defendant gathered the various implements used to beat Uwe and loaded them into the car as well. Michael saw defendant carrying a case of chemical drain cleaner, which defendant said he planned to pour on Uwe's body in order to dissolve it.

Defendant announced he intended to release Michael, L.R. and their children. Phillips strongly disagreed with his decision. Eventually, defendant released the family after warning them that if they contacted the police, he would have them killed. Defendant then left with Phillips in the car containing Uwe, heading towards the Highway 91 freeway. Michael, L.R. and the children left the house, eventually going to Michael's mother's home, where they called the police.

### H. *Murder*

Defendant's car broke down on the Highway 91 freeway, between the Tyler Street and Van Buren Boulevard exits. Phillips called for a tow truck, which arrived at 12:35 a.m. The truck operator testified that Phillips and an African-American male were at the scene. The operator towed the car back to defendant's Riverside house.

Around 9:00 a.m. the next morning, Uwe's body was discovered in a drainage ditch adjacent to the Highway 91 freeway, between the Tyler Street and Van Buren Boulevard exits. He had been shot several times in the head.

### I. *Forensic Evidence*

Police searched the area where Uwe Durbin's body was found and discovered a length of rope, several projectiles and some spent shell casings. The rope was stained with Uwe's blood. The projectiles could not be linked positively to a weapon but were consistent with the cartridges found at the scene.

Police proceeded to defendant's home, and he consented to a police search. In the downstairs bedroom, which looked as if a fight had occurred there, police observed what appeared to be bloodstains on the floor and walls. A hole in the wall appeared to contain human blood and was embedded with human hair. Police also found a pair of gardener's gloves, some surgical latex gloves, some rope and some plastic sheeting, all with Uwe's blood on them. Police also found a roll of duct tape, some .380-caliber cartridges, two D-cell batteries (one with a dent in it), some broken glass and six cans of Red Devil lye.

In defendant's car, police found additional .380-caliber cartridges and some broken glass. The cartridges were stamped by the same manufacturing tool as the spent cartridges found near Uwe's body. In addition, police found some bags, clothing, plastic sheeting and newspapers, all stained with blood. The defense stipulated that the blood on the plastic sheeting found in the car was Uwe's.

The pants defendant was wearing on June 9 (the day after the beating and torture of Uwe began) were confiscated and tested positive for human blood.

A forensic pathologist found Uwe had died from gunshot wounds and blunt force trauma. His body bore five gunshot wounds to the head, all delivered when the gun was only inches away. There was one gunshot wound to his hand, which appeared to be a defensive wound, and one to his knee. In addition, Uwe's body exhibited evidence that blunt force trauma had been applied to his head, torso, arms and legs. Footprints on his body suggested he had been stomped on. He had a broken nose, jaw, ribs and tooth, and two black eyes. One laceration to his head cut through to the cranial bone. His wrists bore evidence that he had been bound, and his neck bore evidence that he had been strangled.

### J. *Other Evidence*

Ennise Marie Anthony, Phillips's sister, told police that defendant had called her from jail and told her he had shot someone six times in the head and once in the knee and had left the body on the freeway. At trial, Anthony

professed not to remember making that statement, even when confronted with a tape recording of her conversation with the police.

Jessica Lira testified that she and her boyfriend, Louie Sistos, bought a television from someone for $40, but a few days later, a woman and a man, both African-American, came to her house and explained that the television had been stolen from them. Lira told them to return when Sistos was home. They returned about an hour later with a large, stocky man Lira identified as Culpepper. He leaned and whispered in her ear that "we know you have the television. We already talked to the guy. He said your husband has it. This guy, you know, he's beat up pretty bad. He's about to die." The knuckles of one of the men were cut and bloody, but by the time of trial Lira was unsure whether that man was Culpepper. Sistos arrived home and gave the group the television, and they returned the $40 he had paid for it.

K.K. testified that in 1992, she had been defendant's fiancee. They quarreled, and the incident escalated until he began to beat her up, throwing her around the room and punching her in the head. He then forced her to orally copulate him before he forcibly sodomized her. The next day, he committed additional forcible sex crimes against her. Although she reported the crimes to the police, she later decided not to press charges and left the country.

### K. Defendant's Statement

Defendant spoke with police the day after the crimes, and a recording of his statement was played for the jury. Defendant confirmed he had been called by the realtor, that he arrived home to find two televisions and a VCR were missing, and that he believed that Uwe Durbin was the culprit because Uwe had previously stolen from him. Defendant admitted driving to Michael Durbin's house looking for Uwe but denied kidnapping or raping anyone. He admitted grabbing Michael by the shirt but denied pointing a gun at him. Defendant said he ended up buying his television back with no problems. He denied he or his wife had killed anyone, although he admitted there was an altercation in his house by two people whom he knew only as "4-Trey" and "Forties." He denied personally participating in the fight and, in fact, claimed he never saw Uwe that day.

### L. Defense at Trial

Prior to trial, the trial court granted a motion to sever the cases of Woods, Parker and Culpepper from that of defendant and Phillips. The court later denied Phillips's motion for severance, but granted a motion to try her and defendant jointly but with separate juries.

Defendant did not testify, and the defense rested without calling any witnesses. Defense counsel argued there was little evidence that defendant had personally committed the acts of torture and murder, emphasizing that Michael Durbin was in the living room during most of the time his brother was beaten. Instead, counsel argued, the other men present (Woods, Parker, Culpepper) were the real culprits. Counsel argued that Ennise Marie Anthony, who recounted some damaging admissions defendant had made from jail, should be disbelieved because her credibility was suspect. In addition, counsel highlighted the discrepancies in the evidence. For example, although L.R. recalled hearing a blowtorch being used to torture Uwe, and Michael testified defendant poured bleach on Uwe's wounds, forensic scientists found no support for these claims. There was also evidence that more than one weapon had been used to murder the victim.

## II. PRETRIAL ISSUES

### A. *Excusal of Prospective Juror M.M. for Cause*

Defendant contends the trial court violated his constitutional rights to a fair trial, an impartial jury, and a reliable penalty verdict (U.S. Const., 5th, 6th, 8th & 14th Amends.), as well as corresponding rights under the state Constitution, by sustaining the prosecutor's challenge for cause to Prospective Juror M.M. As we explain, the trial court did not err.

### 1. *Facts*

All prospective jurors were asked to fill out a written questionnaire. In a section entitled "Opinions About the Death Penalty," the jurors were asked about their general feelings about capital punishment. Prospective Juror M.M. answered this question by writing: "It hard to say to I hear the case. [*Sic.*]" Although the questionnaire asked her to rate her support for the death penalty on a scale from one to 10, and to state whether her opinions about the death penalty would make it difficult for her to vote for either life or death, whether her views on the death penalty had changed over time, and whether she had any religious affiliations that would affect her ability to "take a stance on the death penalty," she failed to provide any answers to these questions.

Asked what she would do if defendant were convicted of a special circumstance murder, she declined to check the options that she would *always* vote for (a) death or (b) life imprisonment, and instead checked option (c), which stated that she "would consider all the evidence and the jury instructions . . . and impose the penalty I personally feel is appropriate." She also affirmed that she would assume the penalty reached would be carried out. Asked whether death or life imprisonment was the more severe punishment, she wrote: "It [is] hard to say."

Following completion of the questionnaires, the trial court conducted voir dire of some of the prospective jurors. When the court questioned Prospective Juror M.M., she asserted there was nothing she wished to add to or subtract from her questionnaire. In response to pointed questioning, she agreed that death was a more severe penalty than life in prison, that she was neutral on the propriety of the death penalty, that she would not treat defendant any differently because he was African-American, that she could apply the law as instructed by the court, and that she did not have any religious objection to the death penalty.

The discussion then took a surprising turn:

"THE COURT: I'm going to ask you the same questions I've been asking the other jurors. Let's assume for argument's sake that you've heard all the evidence in the guilt phase—phase one where you're deciding did he or didn't he do the things he's charged with. The district attorney has put on sufficient evidence, and you believe that the defendant is guilty of murder in the first degree.

"Do you think you could convict him?

"PROSPECTIVE JUROR [M.M.]: Yes.

"THE COURT: Do you think you'd be tempted or would you refuse to find the defendant guilty of first degree murder just to stop yourself from having to go any further?

"PROSPECTIVE JUROR [M.M.]: No.

"THE COURT: Assume that there was sufficient evidence put on to show that the special circumstance[s] were true in the guilt phase. Do you think you'd be able to find that those were true?

"PROSPECTIVE JUROR [M.M.]: Yes.

"THE COURT: Or would you be tempted to vote that they were not true just to avoid the responsibility of jumping off the bungee jump and going into the penalty phase?

"PROSPECTIVE JUROR [M.M.]: No.

"THE COURT: All right. *Do you think you'd automatically vote for life without possibility of parole in a penalty phase, if we got there, regardless of the evidence?*

"PROSPECTIVE JUROR [M.M.]: *Yes.*

"THE COURT: *You do?*

"PROSPECTIVE JUROR [M.M.]: *Uh-huh.*

"THE COURT: *Automatically?*

"PROSPECTIVE JUROR [M.M.]: *Uh-huh.*

"THE COURT: So you are sufficiently against the death penalty that if you found him guilty of first degree murder with a special circumstance, we get to the penalty phase, *it's basically over for you? You've already decided the penalty?*

"PROSPECTIVE JUROR [M.M.]: *Uh-huh.*

"THE COURT: *Uh-huh, yes?*

"PROSPECTIVE JUROR [M.M.]: *Yes.*" (Italics added.)

The prosecutor later moved to exclude Prospective Juror M.M. for cause and the court agreed, noting that she "said she'd automatically give life. As soon as she reached the penalty phase, it would be over for her. I'm prepared to excuse her." Defense counsel said he would not stipulate to her exclusion, arguing that he had not had a chance to question the juror and that he would like an opportunity to himself conduct a "follow-up" voir dire.

When pressed by the trial court to explain what he would ask the juror, counsel replied: "I'm not convinced that she understood exactly what the Court had asked her. I'd like to follow up and make sure that she completely understood that she has the option of making the decision, life or death. [¶] She was somewhat inconsistent in her responses. Initially she said she didn't have an opinion, but she . . . did indicate . . . that she could participate.

"THE COURT: No, she didn't. I did ask her several times, and I said, in other words, if we got to the penalty phase, and you had found him guilty of murder with a special circumstance, murder in the first degree, it would be over for you? She said it would be over, she'd always give life, she couldn't give death." The court then excused Prospective Juror M.M. for cause.

### 2. *Discussion*

The United States Constitution guarantees a criminal defendant a trial by an impartial jury. As we have explained in numerous recent decisions in

capital cases, "[t]o achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath." (*People v. Blair* (2005) 36 Cal.4th 686, 741 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; see *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].)

" 'In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 696 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

" ' "There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." [Citation.] "Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 497–498 [61 Cal.Rptr.3d 526, 161 P.3d 58].)

The United States Supreme Court has recently expounded on the propriety of deferring to a trial court's ruling on a challenge for cause, explaining that "the finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' [Citation.] Thus, when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2223].) Accordingly, trial courts must, before trial, engage in a conscientious attempt to determine a prospective juror's views regarding capital punishment to ensure that any juror excused from jury service meets the constitutional standard, thus protecting an accused's right to a fair trial and an impartial jury. (*People v. Heard* (2003) 31 Cal.4th 946, 963–968 [4 Cal.Rptr.3d 131, 75 P.3d 53].)

In arguing the trial court abused its discretion by excusing Prospective Juror M.M., defendant focuses on the juror's written questionnaire answers and oral responses on voir dire, specifically that she rated her support for the death penalty as only a five on a scale of one to 10, that she was capable of voting to impose the death penalty if appropriate for the case, that she would not vote against a guilt or special circumstance verdict warranted by the evidence merely to avoid the penalty phase, and that she had no religious opposition to capital punishment. When asked whether it would be difficult for her to vote for the death penalty in a case such as the present one, she replied in the negative.

We do not know how the juror appeared to the court when she made these affirmations, whether her demeanor suggested sincerity, dissimulation or merely confusion. We do know she appeared to change her mind during the course of the court's questioning, suddenly contradicting herself and inform-ing the court that if defendant was convicted of first degree murder, she would "automatically" vote for a life sentence instead of the death penalty. The trial court, clearly surprised at her change of direction, followed up to make sure she had not merely misspoken. She had not. The court then asked her directly whether she was "sufficiently against the death penalty" that if she found defendant guilty of murder with special circumstances at the guilt phase, she would go no further, that the penalty determination was "basically over" for her, and that she had "already decided the penalty." She agreed unequivocally.

The trial court was in the best position to assess the juror's state of mind, based on her conflicting responses, her demeanor, her vocal inflection and other nonverbal cues. "Even when '[t]he precise wording of the question asked of [the juror], and the answer [she] gave, do not by themselves compel the conclusion that [she] could not under any circumstance recommend the death penalty,' the need to defer to the trial court remains because so much may turn on a potential juror's demeanor." (*Uttecht v. Brown, supra,* 551 U.S. at p. 8 [127 S.Ct. at p. 2223].) Faced with a conflict in the juror's responses, the trial court pursued the matter and the juror finally admitted she would not vote to impose the death penalty. Although defendant argues the juror's conflicting responses reflected simple confusion rather than a fluid and evolving position that coalesced to produce an anti-death-penalty epiphany, we are unable to resolve that point from the cold record and leave it to the trial court in the first instance to ascertain the juror's true state of mind.

Defendant argues the trial court erred by failing to permit defense counsel to ask the juror additional clarifying questions, but we reject the point. One can always argue further questioning might yield different and more favorable results, but that is a matter committed to the discretion of the trial court. "A

trial court has the discretion to deny all questioning by counsel when a prospective juror gives 'unequivocally disqualifying answer[s]' [citation], and may subject to reasonable limitation further voir dire of a juror who has expressed disqualifying answers [citations]." (*People v. Samayoa* (1997) 15 Cal.4th 795, 823 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Sufficient evidence here supports the trial court's decision to terminate questioning, as the court had already considered the juror's questionnaire answers and her responses during voir dire. Moreover, the court asked her pointed questions when she equivocated, and it was within the court's discretion to conclude that further questioning would have been of little value. Certainly defense counsel did not identify any area of inquiry not already covered by the trial court. We conclude the court did not abuse its discretion, nor violate defendant's constitutional rights, by excusing Prospective Juror M.M. for cause.

### B. *Excusal of Prospective Jurors M.F. and C.T. for Cause*

Defendant next contends the trial court violated his constitutional right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, by sustaining the prosecutor's challenges for cause to Prospective Jurors M.F. and C.T. Unlike the challenge to the excusal of Prospective Juror M.M., the trial court excused M.F. and C.T. based solely on their written responses in their juror questionnaires, with no oral, in-person examination. Although defendant contends excusing these jurors without personally examining them was improper, as we explain, the trial court did not err.[2]

#### 1. *Facts*

As noted above, all prospective jurors were asked to complete a written questionnaire in which several questions addressed the death penalty. Preceding these questions was a long prefatory statement setting forth the basic procedure applicable to capital cases.[3] The questions then began:

"40. Briefly describe your general feelings about the death penalty.

---

[2] Defendant also challenges, on the same ground, the trial court's purported granting of the prosecution's challenge for cause to Prospective Juror A.W. Although the prosecutor challenged her for cause based solely on her answers in the jury questionnaire, the trial court deferred its decision at the time of the challenge. The record does not indicate the court ever returned to the matter, or that the court ever actually excused A.W. Accordingly, we reject the claim as to this prospective juror.

[3] "Questions concerning your views on the death penalty are required by law. The asking of them is not meant to imply that a defendant is guilty or that you will in fact ever be called upon to decide the penalty in this case. If you find the defendant not guilty, the trial will end and your beliefs about the death penalty will not be relevant. If you find the defendant guilty and a special circumstance to be true, then there will be a second phase of the trial to determine whether the penalty will be death or life in prison without the possibility of parole.

"_____

"a. On a scale of 1-10, with 10 being strongly in favor of the death penalty, 5 having no opinion, and 1 being strongly against the death penalty, how would you rate yourself?

"strongly against no opinion strongly in favor

" 1 2 3 4 5 6 7 8 9 10

"b. Is there a particular reason why you feel as you do/about the death penalty?

"___ Yes ___ No

"If yes, please explain: _____

"c. If you are <u>against</u> the death penalty, would your opinion make it difficult for you to vote for the death penalty in this case, regardless of what the evidence was?

"___ Yes ___ No

"Please explain: _____

"d. If you are <u>in favor of</u> the death penalty, would your opinion make it difficult for you to vote for life without the possibility of parole regardless of what the evidence was?

(A special circumstance is an allegation that relates to the charged murder, upon which the jury is asked to make a finding. For instance, was the murder committed in the commission of certain felonies such as burglary, robbery or rape?)

"Should there be a penalty phase, the jury will be asked to determine the penalty. The choices are death or life without the possibility of parole.

"The jury determines the penalty by considering factors in aggravation and mitigation. Evidence in aggravation may include the circumstances of the offense charged, prior felony convictions, the presence of criminal activity other than for which the defendant has been tried which involves the defendant's use or attempted use of force or violence or the express or implied threat to use force or violence.

"Evidence in mitigation may include the defendant's upbringing, mental condition, education, age, drug/alcohol use, the circumstances of the offense, the defendant's role in the offense, etc.

"There is a wide spectrum of possible evidence that you may be asked to consider if this case should go to a penalty phase. We cannot, of course, tell you now what that evidence would be. Nor, can you be expected to tell us the weight, if any, you might give particular evidence."

"___ Yes ___ No

"Please explain: _____

"e. In what ways, if any, have your views about the death penalty changed over time? _____

"41. Do you have any religious affiliations that take a stance on the death penalty?

"___ Yes ___ No

"If yes, please explain: _____" (Original underscoring.)

Question 42 is critical to our holding in this case because the trial court used it as the basis for excusing both Prospective Jurors M.F. and C.T. That question provided: "It is important that you have the ability to approach this case with an open mind and a willingness to fairly consider whatever evidence is presented as opposed to having such strongly held opinions that you would be unable to fairly consider all the evidence presented during the possible penalty phase. [¶] *There are no circumstances under which a jury is instructed by the court that they must return a verdict of death. No matter what the evidence shows, the jury is always given the option in a penalty phase of choosing life without the possibility of parole.* Assuming a defendant was convicted of a special circumstances murder, would you:

"___ a. No matter what the evidence was, <u>ALWAYS</u> vote for the death penalty.

"___ b. No matter what the evidence was, <u>ALWAYS</u> vote for life without possibility of parole.

"___ c. I would consider all the evidence and the jury instructions as provided by the court and impose the penalty I personally feel is appropriate." (Italics added, original underscoring and capitalization.)

The trial court explained its methodology, which was focused on question 42. After culling the jury pool for hardship excusals, the remaining jurors would be asked to complete the questionnaire. If a juror reported that he or she would "automatically vote for death or automatically vote for life at that point," the parties would be asked to stipulate to the juror's excusal. According to the trial court: "My view, if they checked question 42-a or 42-b, they're gone . . . [¶] [w]ithout any need for follow-up." "There's not much

distinction between [42]-a and [42]-b, and that's why we're excusing people at both ends of the spectrum."

Following receipt of the completed questionnaires, the trial court discussed them with the attorneys for defendant and codefendant Phillips as well as with the prosecution. The attorneys for all sides stipulated to the excusal for cause of certain prospective jurors based solely on their written answers to these questions, with no oral voir dire. For example, Prospective Jurors A.C. and D.S., who both rated themselves a 10 in question 40-a (i.e., strongly in favor of the death penalty) and stated they would "always" vote for the death penalty in question 42-a, were excused with the consent of both sides. Similarly, Prospective Jurors D.K. and F.M., who both rated themselves a one (i.e., strongly against the death penalty) and stated they would "always" vote for life imprisonment, were excused by stipulation.

Prospective Juror M.F. answered question 40 by saying: "I am a religious person and do not feel that two wrongs make a right. However, I am unsure about the death penalty in itself. I really don't know." She rated herself a four on the scale of one to 10, meaning she was slightly against the death penalty. In explanatory comments, she wrote: "I could not see myself punishing or participating in the punishment dealing w/the death penalty," and "It [the death penalty] is not the answer to our problems." In answering question 42, however, she checked "b," that is, that "[n]o matter what the evidence was, [she would] ALWAYS vote for life without possibility of parole."

Discussing this juror, the trial court noted: "She rated herself a four, but she says no matter what the evidence was she'd always vote for life without possibility of parole. She couldn't see herself punishing or participating in the punishment dealing with the death penalty. The media have made her very unsure, however, once she puts herself in the shoes of the victim's family. She has a religious stance. It's not the answer to our problem, the death penalty is not. She's a religious person. She doesn't feel two wrongs make a right. She's unsure about the death penalty. She really doesn't know. I think she's substantially impaired [within the meaning of *Wainwright v. Witt, supra*, 469 U.S. 412]."

Defense counsel requested that the trial court conduct a followup oral examination of M.F., explaining that he was "not willing to stipulate [to her excusal]." The court declined to examine the juror, explaining that "I'm going to make a finding if you're not willing to stipulate right now."

Prospective Juror C.T. answered question 40 by saying: "I believe that if the defendant gets to the penalty phase I would probably look at the <u>life without possibility of parole</u> [option], more than the death penalty. That is

because of my religious background." She rated herself a four on the scale of one to 10, meaning she was slightly against the death penalty. Like Prospective Juror M.F., C.T. answered question 42 by checking option "b," proclaiming she would "always" vote for life.

The trial court noted that "I think her views meet the substantial impairment test." "She said she'd never impose the death penalty, because she's a Christian, although she's a four on the scale. I think she meets the substantial impairment test." Defense counsel requested that the court conduct a followup examination of the juror, whereupon the prosecutor reminded the court that at that point, every prospective juror who had checked option 42-b and indicated they would always choose life imprisonment had been excluded. The court agreed and excused C.T. based solely on her written answers in the questionnaire.

### 2. *Discussion*

■ We addressed the propriety of excusing prospective jurors during a capital case voir dire, based solely on their written responses in a juror questionnaire, in *People v. Stewart* (2004) 33 Cal.4th 425 [15 Cal.Rptr.3d 656, 93 P.3d 271] (*Stewart*). In that case, the trial court excused for cause five prospective jurors, finding their views as expressed in the questionnaire were clearly and unambiguously against the death penalty. (*Id.* at pp. 444–445.) Setting forth the applicable procedures, we explained that "[b]efore granting a challenge for cause concerning a prospective juror, over the objection of another party, a trial court must have sufficient information regarding the prospective juror's state of mind to permit a reliable determination as to whether the juror's views would ' "prevent or substantially impair" ' the performance of his or her duties (as defined by the court's instructions and the juror's oath) . . . ." (*Id.* at p. 445.) "The prosecution, as the moving party, [bears] the burden of demonstrating to the trial court that this standard was satisfied as to each of the challenged jurors." (*Ibid.*; see *Wainwright v. Witt, supra*, 469 U.S. at p. 423.)

■ We explained in *Stewart* that the mere fact a prospective juror, in a written questionnaire, checked a box or otherwise expressed a personal opposition to the death penalty does not permit the court to automatically disqualify him or her from the jury. "Decisions of the United States Supreme Court and of this court make it clear that a prospective juror's personal conscientious objection to the death penalty is not a sufficient basis for excluding that person from jury service in a capital case under [*Wainwright v.*] *Witt, supra*, 469 U.S. 412. In *Lockhart v. McCree* (1986) 476 U.S. 162, 176 [90 L.Ed.2d 137, 106 S.Ct. 1758] . . . , the high court observed that 'not all those who oppose the death penalty are subject to removal for cause in

capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' Similarly, in *People v. Kaurish* (1990) 52 Cal.3d 648, 699 [276 Cal.Rptr. 788, 802 P.2d 278] . . . , we observed: 'Neither *Witherspoon* [*v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]] nor [*Wainwright v.*] *Witt*, . . . nor any of our cases, requires that jurors be automatically excused if they merely express personal opposition to the death penalty. The real question is whether the juror's attitude will " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt, supra*, 469 U.S. at p. 424, fn. omitted.) A prospective juror personally opposed to the death penalty may nonetheless be capable of following his oath and the law. *A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict.*' (Italics added.)" (*Stewart, supra*, 33 Cal.4th at p. 446.)

 The critical flaw in *Stewart* was the trial court's reliance on that part of the questionnaire that asked jurors whether they held views that would " 'prevent or make it very difficult' " for the prospective juror " '[t]o ever vote to impose the death penalty.' " (*Stewart, supra*, 33 Cal.4th at pp. 442–443.) We explained: "In light of the gravity of [the death penalty], for many members of society their personal and conscientious views concerning the death penalty would make it 'very difficult' ever to vote to impose the death penalty. As explained below, however, a prospective juror who simply would find it 'very difficult' ever to impose the death penalty, is entitled— indeed, duty bound—to sit on a capital jury, unless his or her personal views actually would prevent or substantially impair the performance of his or her duties as a juror." (*Id.* at p. 446.)

Although we concluded in *Stewart* that the trial court erred by excusing five prospective jurors for cause based solely on the combination of their checked answers and written comments in the questionnaire, we stopped short of recognizing a bright-line rule, though we hinted that one might be justifiable. "[W]e need not and do not hold that a trial court never may properly grant a motion for excusal for cause over defense objection based solely upon a prospective juror's checked answers and written responses contained in a juror questionnaire. We are, however, unaware of any authority upholding such a practice." (*Stewart, supra*, 33 Cal.4th at pp. 449–450, fn. omitted.)

More recently, however, we modulated any such suggestion. Addressing the issue in *People v. Avila* (2006) 38 Cal.4th 491 [43 Cal.Rptr.3d 1, 133 P.3d

1076] (*Avila*), we opined: "The question left undecided in *Stewart* is squarely presented here, and we now hold that a prospective juror in a capital case may be discharged for cause based solely on his or her answers to the written questionnaire *if it is clear from the answers that he or she is unwilling to temporarily set aside his or her own beliefs and follow the law.*" (*Id.* at p. 531, italics added.) In *Avila*, the trial court excused four jurors without orally questioning them, based solely on their written answers to the jury questionnaire. We found no error and distinguished *Stewart* on the ground that the jury questionnaire in *Stewart* included a "material flaw" not present in the questionnaire used in *Avila*. (*Avila*, at p. 530.) Thus, we explained that whereas the questionnaire in *Stewart* asked whether a juror's "conscientious opinion or belief about the death penalty . . . ' "would prevent *or make it very difficult*" ' " (*Avila*, at p. 530) for a juror to vote to convict of first degree murder, sustain a special circumstance or impose the death penalty, the questionnaire in *Avila* instead asked whether a juror would "automatically" so vote (*id.* at p. 528, fn. 23, underscoring omitted). "[B]ecause mere *difficulty* in imposing the death penalty does not, per se, prevent or substantially impair the performance of a juror's duties" (*id.* at p. 530), the decision in *Stewart*— that the trial court erred by excusing prospective jurors based solely on their written questionnaire answers—was correct. But "nothing in *Stewart* indicates that an excusal without oral voir dire is improper where the prospective juror's answers to a jury questionnaire *leave no doubt* that his or her views on capital punishment would prevent or substantially impair the performance of his or her duties in accordance with the court's instructions and the juror's oath." (*Avila*, at p. 531, italics added.)

From this discussion, the rule emerges that reliance on written responses alone to excuse prospective jurors for cause is permissible if, from those responses, it is clear (and "leave[s] no doubt") that a prospective juror's views about the death penalty would satisfy the *Witt* standard (*Wainwright v. Witt, supra*, 469 U.S. 412) and that the juror is not willing or able to set aside his or her personal views and follow the law. Applying this rule here, we conclude the trial court did not err when it excused Prospective Jurors M.F. and C.T. for cause. Although the questionnaire used in this case did not, as in *Avila*, ask whether a prospective juror would "automatically" vote for either life or death irrespective of the evidence (*Avila, supra*, 38 Cal.4th at p. 528, fn. 23), questions 42-a and 42-b in this case asked jurors whether, "[n]o matter what the evidence was," would they "<u>ALWAYS</u> vote for the death penalty" or "for life without possibility of parole." This phraseology is the equivalent of that which we approved in *Avila*; the capitalization and underscoring of the word "always" must have made clear to all prospective jurors that the question sought to determine if the juror would automatically vote one way or the other irrespective of the evidence.

This reading of questions 42-a and 42-b is consistent with the import of the questionnaire as a whole. The prefatory statement at the beginning of the section of the questionnaire concerning the death penalty (see *ante*, pp. 781–782, fn. 3) gave prospective jurors the basic outline of the penalty phase procedures involved, including the need for a fair assessment and weighing of aggravating and mitigating circumstances. This written outline reinforced the trial court's oral statement, delivered before the jurors were given the questionnaires, which provided similar background information. For example, the court informed the prospective jurors that "[f]actors in mitigation include good things about the defendant for the purpose of showing that the appropriate sentence in the case is life without possibility of parole. And within those guidelines, after a consideration and weighing of all the factors, *you have the discretion as to what penalty to impose*." (Italics added.)

Then, at the beginning of question 42, the prospective jurors were informed that "[t]here are no circumstances under which a jury is instructed by the court that they <u>must</u> return a verdict of death. No matter what the evidence shows, the jury is always given the option in a penalty phase of choosing life without the possibility of parole." This passage further reinforced the admonition that a juror at the penalty phase need not automatically vote one way or the other. Absent some evidence that Prospective Jurors M.F. or C.T. did not read these statements or misunderstood them, they must have been aware when they checked 42-b (i.e., that "[n]o matter what the evidence was, [they would] <u>ALWAYS</u> vote for life without possibility of parole") that they would have the option to vote for either life or death in their discretion. This is especially true because—by checking 42-b—M.F. and C.T. necessarily chose *not* to check 42-c: "I would consider all the evidence and the jury instructions as provided by the court and impose the penalty I personally feel is appropriate." In short, a fair reading of the questionnaire demonstrates that M.F. and C.T. must have known the scope and nature of the discretion they would wield in the penalty phase, but nonetheless checked 42-b, indicating that they would *always* vote for life over death *irrespective* of the facts and circumstances.[4]

---

[4] We note that Prospective Juror C.T. answered "yes" to question 28, which asked, "[i]f the judge gives you an instruction on the law that differs from your beliefs or opinions, will you follow the law as the judge instructs you?" That general question, however, *preceded* the section of the questionnaire devoted to "Opinions About the Death Penalty," immediately followed a question as to whether the prospective juror's religious or moral feelings would make it difficult or impossible to sit in judgment of another person, and was grouped within a section testing the prospective juror's ability to follow the law concerning the presumption of innocence, the privilege against compelled self-incrimination, and other principles of law relating to the guilt phase of the trial. The prospective juror's affirmative response to question 28 was thus not necessarily inconsistent with her subsequent response to question 42, which inquired into the juror's specific ability to consider all the evidence that would be presented at

Although the jury questionnaire used in this case, as in *Stewart*, admittedly asked jurors whether their opinion about the death penalty "would . . . *make it difficult* for you to vote for the death penalty in this case" (italics added), the similarity with *Stewart* ends there, for the trial court did not excuse Prospective Jurors M.F. and C.T. on that basis. Instead, the court was clear that if any prospective juror checked 42-a or 42-b, the court would ask the parties to stipulate to the juror's excusal because, in the trial court's opinion, such a response indicated the juror would "automatically vote for death or automatically vote for life at that point." As the trial court explained: "My view, if they checked question 42-a or 42-b, they're gone . . . [¶] [w]ithout any need for follow-up." "There's not much distinction between [42]-a and [42]-b, and that's why we're excusing people at both ends of the spectrum." Thus, unlike in *Stewart*, *supra*, 33 Cal.4th 425, use of the "make it difficult" language here does not require reversal.[5]

Of course, a face-to-face assessment of the sincerity and understanding of a prospective juror may, under particular circumstances, be preferable, and trial courts retain discretion to examine jurors in person. (*People v. Heard, supra*, 31 Cal.4th at p. 965 ["If the trial court remained uncertain as to whether [a prospective juror's] views concerning the death penalty would impair his ability to follow the law or to otherwise perform his duties as a juror, the court was free . . . to follow up with additional questions."].) Even a person with a strongly held view in favor of, or against, the death penalty could possibly set aside those views and decide a case according to the law. (*Lockhart v. McCree, supra*, 476 U.S. at p. 176; *Avila, supra*, 38 Cal.4th at p. 531.) Moreover, a trial court may have reason to suspect a prospective juror is a poor reader or may simply have misunderstood the questionnaire. Although reading the questionnaire in this case as a whole convinces us the trial court did not err in concluding that prospective jurors who checked option 42-b would not set aside their personal feelings about the death penalty regardless of the evidence that might be presented at the penalty phase, this important point could be clarified in future cases simply by including a question asking this point directly in the context of questions concerning attitudes towards the death penalty. For example, question 91 in the questionnaire used in *Avila* asked: " 'Do you honestly think that you could set aside your personal feelings and follow the law as the Court explains it to you, even if you had strong feelings to the contrary?' " (*Avila*, at p. 528, fn. 23.)

---

the penalty phase before selecting the appropriate penalty. Indeed, Prospective Juror M.F. stated that question 28 was "kind of vague" and said that she was "not sure what this refers to."

[5] Although we find use of the "make it difficult" language in the jury questionnaire is not dispositive as it was in *Stewart*, future courts would be wise to omit such language to avoid confusion.

We appreciate that trial courts may desire to streamline the death qualification voir dire process in capital cases, for such jury selection procedures can be a long and tedious business. Prudent use of written jury questionnaires can be a valuable addition to the process, serving as a screening tool during death qualifications of jurors. We need not emphasize, however, that those accused of capital crimes have an important interest at stake, and because their right to a fair and impartial jury is a vital constitutional concern, trial courts should err on the side of caution when questionable or marginal cases arise. But because the jury questionnaire used here, and especially questions 42-a, 42-b and 42-c, made it sufficiently clear that Prospective Jurors M.F. and C.T., by checking 42-b, met the standard set forth by the United States Supreme Court in *Wainwright v. Witt, supra,* 469 U.S. 412, we conclude the trial court did not err by excluding them for cause without personally examining them.

### III. TRIAL ISSUES

### A. *Precluding Cross-examination on Witness's Drug Use*

Defendant contends the trial court's exclusion of evidence of Michael Durbin's alleged long-term methamphetamine abuse, and its resultant effect on his ability to "process and recall" details of the crimes, violated defendant's right to confront and cross-examine the witnesses against him, and to a fair trial and a reliable penalty determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. We reject the claim for two reasons: first, defendant failed to preserve this claim for appeal; and second, the trial court's ruling did not violate defendant's constitutional rights.[6]

### 1. *Facts*

The trial court considered at an in limine hearing whether any of Michael Durbin's several prior convictions could be introduced against him as impeachment. The court ruled Durbin's 1992 burglary conviction was admissible, as was his 1997 conviction for spousal abuse, but excluded two other spousal abuse incidents as both too trivial and cumulative to the felony conviction. The court then considered the admissibility of Durbin's 1996 convictions for possession of drug paraphernalia and being under the influence of a controlled substance, offenses for which he was diverted from the criminal justice system. The court expressed its view that these crimes did not involve moral turpitude (see *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]) and that it intended to exclude them for that

---

[6] To the extent defendant further argues the court's ruling violated his rights under article I, section 28 of the California Constitution and Evidence Code section 352, these claims are forfeited because defendant failed to raise them below.

reason. When counsel for codefendant Phillips asserted that he intended to impeach Durbin with his drug use, the court repeated that the crimes did not involve moral turpitude but opined that it might change its mind if there was evidence Durbin was actually under the influence at the time of the crimes.

The court then asked the parties whether Durbin was in fact under the influence of drugs when the crimes were committed. Mr. Wyatt, counsel for Phillips, said he did not know, but the prosecutor, Ms. Danville, spoke up, revealing that she had spoken to Durbin and L.R. the previous week and had learned, apparently for the first time, that they had each smoked some methamphetamine *the day before* the crimes. The prosecutor opined that she intended to question both witnesses on the topic before the jury. The following colloquy then occurred:

"THE COURT: All right. I think prior drug use is not relevant unless there's a denial that they had taken methamphetamine on or near the date of the events at issue.

"MR. WYATT: Well—

"THE COURT: If they deny it, then, of course, we have direct impeachment potential there. But for the moment, simply credibility on other testimony, I'm excluding it, all right?

"MR. WYATT: My—the reason I would want to go into [it] is, for instance, I didn't know about the methamphetamine until you just solicited it from the district attorney just a few seconds ago.

"But we know that people that are using drugs, particularly like methamphetamine or crack or PCP, the effect and the consequences are not just for the moment, that they may have delayed reactions, and that would affect their perceptions.

"THE COURT: That's a whole different issue than straight credibility.

"MR. WYATT: Oh, correct.

"THE COURT: Do you intend to call an expert?

"MR. WYATT: No, I—I think I can get it from either of them. I think they're probably users and probably are experts on drugs, and I think we can elicit that from their testimony.

"THE COURT: Miss Danville.

"Ms. DANVILLE: I would highly object.

"The fact that they had used some [drugs] the day before [the murder] and may have still been somewhat a little bit under the influence is relevant to their ability to perceive the events about which they're testifying, but beyond that it's extremely inflammatory, and it has no relevance to this case.

"THE COURT: All right. Mr. Wyatt, you can ask them what they took on or around the date in question.

"MR. WYATT: Thank you.

"THE COURT: You can ask them the effects it had on them.

"MR. WYATT: Thank you.

"THE COURT: Beyond that I don't want you to go without a further [Evidence Code section] 402 [hearing] on the issue.

"MR. WYATT: Thank you. No, that's fine. I understand."

Mr. Belter, defense counsel for defendant, uttered no comment and made no objection throughout this entire exchange.

On direct examination, Michael Durbin testified he had smoked some methamphetamine the day before the crimes, that as a result he felt a bit tired the next day, but that the drug use did not otherwise affect him. When asked on cross-examination how much he had ingested, he testified he had smoked a quarter of a gram with his girlfriend, L.R. When Mr. Wyatt asked him when he next used drugs, the trial court sustained the prosecutor's objection. During Mr. Belter's cross-examination, Durbin affirmed his earlier testimony that his use of methamphetamine the day before the crimes had left him tired. He also stated that a quarter of a gram of methamphetamine was not a lot to smoke in one sitting for him. In her testimony, L.R. corroborated Durbin's testimony in every respect; that is, she testified she smoked a quarter of a gram of methamphetamine with Durbin the day before the crimes and felt tired the next day as a result. Neither defendant called an expert witness to describe the impact of long-term drug use on one's perception or memory.

### 2. Discussion

Before we determine whether defendant's rights were violated, we must decide whether he preserved this claim for appellate review. Although Mr. Wyatt, counsel for codefendant Phillips, objected to the exclusion of

evidence of Michael Durbin's drug use, defendant did not join in the objection or interpose his own. "Generally, failure to join in the objection or motion of a codefendant constitutes a waiver of the issue on appeal." (*People v. Santos* (1994) 30 Cal.App.4th 169, 180, fn. 8 [35 Cal.Rptr.2d 719]; see *People v. Mitcham* (1992) 1 Cal.4th 1027, 1048 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

A litigant need not object, however, if doing so would be futile. (*People v. Brown* (2003) 31 Cal.4th 518, 553 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) Defendant contends that having seen how the trial court treated his codefendant's motion, he reasonably believed making his own motion would have been futile. We disagree. The trial court permitted Phillips's counsel to ask Durbin what drugs he took around the time of the crime and their effect on him, but left the door open to eliciting additional information if counsel would call an expert witness and undergo an Evidence Code section 402 hearing, presumably to determine the effect such drug use would have on a person's perception and recall ability. Defendant was thus on notice that an objection would not have been futile provided he satisfied the court's reasonable prerequisites. The court also stated it would reconsider its ruling if a party could present evidence that Durbin was under the influence at the time of the crimes. Because an objection would not necessarily have been futile, defendant's failure to object or affirmatively join codefendant Phillips's motion forfeited the issue for appeal.

■ Even had the issue been preserved, we would find no error. "The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' This federal constitutional right to confront adverse witnesses in a criminal prosecution applies to the states (*Pointer v. Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]) and is also guaranteed independently by the California Constitution (Cal. Const., art. I, § 15) and by statute (§ 686). The primary reason an accused is entitled to confront adverse witnesses is to permit cross-examination. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 [89 L.Ed.2d 674, 106 S.Ct. 1431]; *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121 [99 Cal.Rptr.2d 149, 5 P.3d 203].) '[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.' (*Pointer v. Texas, supra*, at p. 405.)" (*People v. Brown, supra*, 31 Cal.4th at pp. 537–538.) " 'It does not follow, [however], that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.' " (*People v. Williams* (1997) 16 Cal.4th 153, 207 [66 Cal.Rptr.2d 123, 940 P.2d

710].) "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [88 L.Ed.2d 15, 106 S.Ct. 292] (*per curiam*).)

■ The trial court's treatment of this issue was correct and did not violate defendant's constitutional rights. There was no evidence Michael Durbin had ingested any drugs on the day of the crimes, and neither counsel suggested they had evidence he was an habitual user. Moreover, even if he was, neither defense counsel accepted the trial court's suggestion to call an expert to lay a foundation regarding the effect of habitual methamphetamine use on one's ability to perceive and recall events. "Evidence of habitual narcotics . . . use is not admissible to impeach perception or memory unless there is expert testimony on the probable effect of such use on those faculties." (*People v. Balderas* (1985) 41 Cal.3d 144, 191 [222 Cal.Rptr. 184, 711 P.2d 480]; see also *People v. Pargo* (1966) 241 Cal.App.2d 594, 600 [50 Cal.Rptr. 719]; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 266, pp. 337–338.) Defendant does not persuasively explain how this long-standing evidentiary rule undermined his ability to effectively cross-examine Michael Durbin or L.R.

Even if the court had erred, we would find any error was harmless. Defendant was able to impeach Durbin with his two prior felony convictions and was also able to place before the jury evidence that both Durbin and L.R. had smoked methamphetamine the day before the crimes. There is no suggestion in the record, however, that either Durbin or L.R., as a result of their drug use, misperceived or misrecollected the details of the crimes. They were well acquainted with defendant, and their account, including details about seeing defendant choke the victim with a dog chain and beat him with D-cell batteries placed inside a gardener's glove, was amply corroborated by independent evidence. Moreover, the testimony of both witnesses was clear and direct and betrayed no suggestion their recall of the night in question was at all impaired by their previous drug use. In sum, defendant failed to preserve this issue for appeal, and the trial court did not commit constitutional error, prejudicial or otherwise, in excluding the evidence of Michael Durbin's habitual drug use.

## B. *Admission of Evidence of Uncharged Rape*

Defendant raises a number of arguments related to the trial court's admission of evidence that five years before the crimes against Uwe Durbin and L.R., defendant had committed a number of forcible sex crimes against his then girlfriend, K.K. As we explain, we reject all of these claims.

### 1. *Facts*

Prior to trial, the prosecution moved to admit evidence of defendant's uncharged sex crimes against K.K. pursuant to Evidence Code section 1108. Defendant opposed the motion, relying largely on Evidence Code section 1101. The matter was discussed at a hearing, and the trial court made a tentative ruling admitting the evidence. The court noted the crimes against K.K. were not remote; the degree of similarity between the past and present crimes, while not "great," was sufficient to permit admission of the evidence; and it was "highly relevant on the issue of disposition to commit sexual offenses." Although the court was concerned that proof of the prior uncharged crimes would consume an undue amount of time and distract the jury, it noted the burden was on the defense to show that, and it reserved the right to change its ruling if defendant could make an offer of proof that he intended to call several witnesses to refute the victim. The court specifically referenced Evidence Code section 352 in its ruling. Defendant's request that he be allowed to testify and refute K.K.'s expected testimony without subjecting himself to cross-examination on other topics was denied because, according to the trial court, a waiver of one's Fifth Amendment right was a waiver for all purposes.[7]

K.K., a Finnish national, testified she was 22 years old when she met defendant in February 1992. She began an intimate relationship with him, and they planned to marry. They had been living with defendant's mother but were asked to leave, so they went to defendant's mother's place of business, a bail bond office, to sleep in the back room. Once there, defendant left and did not answer his telephone or pager for several hours, enraging K.K. When he finally returned, he and K.K. quarreled, and she broke first his pager and then a telephone. Defendant began beating her with his fists, throwing her around the office. According to K.K., defendant then forced her to orally copulate him, before forcibly sodomizing her. She tried to fight him off but was unsuccessful. Afterwards, defendant removed a gun from a box in the office and handled it in her presence, although he did not overtly threaten her with it. She fell asleep, but the next morning defendant again forcibly raped her and forced her to orally copulate him. He covered her mouth during the rape to keep her quiet.

A friend came and picked K.K. up and took her to a hospital where she spoke to a police officer. She did not tell the officer about the gun because she knew defendant was on parole and "would have gone to jail for a long time." She still loved him and even visited him both in jail and in prison. (The jury was not told why defendant was in jail and prison during that time.) K.K. returned to Finland in January 1993, explaining that although they still

---

[7] As the trial court opined: "A waiver is a waiver is a waiver."

planned to marry, she was having doubts and was afraid defendant would kill her when he was released from prison.

Defendant did not object to any of K.K.'s references to jail or prison, or her expressed belief that he might attempt to kill her. In fact, on cross-examination, defense counsel referred to defendant's time in Corcoran State Prison and how far the prison was from Los Angeles, apparently attempting to underscore the depth of K.K.'s affection for defendant. In response to defense counsel's question that defendant "seemed to wander around a lot; is that right?," K.K. replied: "Yes. He was pimping women." Counsel did not ask that the answer be stricken or the jury admonished.

Defendant did not call any witnesses to refute K.K.'s account.

Following K.K.'s testimony, the trial court, the jury not being present, noted: "I was not aware when I made the [Evidence Code section] 352 ruling, I don't believe, of the fact that you intended to bring out the visits to Corcoran, the fact that the defendant was on parole or that there was any gun issue in this. [¶] I assume from your cross-examination that you were aware of this, Mr. Belter." Defense counsel explained he had learned of the gun use the day before. The prosecutor then explained: "I found out yesterday, and I told Mr. Belter yesterday about the gun. I didn't intend to bring out the Corcoran visits, but Mr. Belter indicated he was going to bring them out. So they just kind of came out." Defendant's counsel explained that he intended to characterize the crimes against K.K. as "more of a date-rape" situation in an attempt to minimize their seriousness. The trial court responded: "Well, I had no idea that either of you were going to bring out his parole status or imprisonment in Corcoran, which I think is problematic. But, I mean, there are ways to impeach without bringing that out, saying you went a long way to see him. I take it it was a tactical decision."

Following the close of the guilt phase evidence, the trial court reiterated its concern that the jury had learned of defendant's parole status and prior incarceration. The court stated its intention to instruct the jury to consider that evidence solely for assessing K.K.'s credibility and not to show defendant's bad character. The court later so instructed the jury.

### 2. *Discussion*

■ Defendant raises a number of related arguments challenging the admission of evidence of his uncharged crimes against K.K., but we find none availing because the evidence was admissible under Evidence Code section 1108. At the time of defendant's trial, that section provided in pertinent part: "(a) In a criminal action in which the defendant is accused of a

sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Added by Stats. 1995, ch. 439, § 2, p. 3429.) Defendant first argues that Evidence Code section 1108 is unconstitutional because it violates his constitutional right to due process of law. We rejected that precise argument in *People v. Falsetta* (1999) 21 Cal.4th 903 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*), certiorari denied *sub nomine Falsetta v. California* (2000) 529 U.S. 1089 [146 L.Ed.2d 645, 120 S.Ct. 1723], where we explained that although evidence of criminal propensity had long been excluded in this state, such "long-standing practice does not necessarily reflect a *fundamental*, unalterable principle embodied in the Constitution" (*Falsetta*, at p. 914), that a rule permitting admission of such evidence does not offend those fundamental due process principles (*id.* at p. 915), and that "the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from [the] defendant's due process challenge" (*id.* at p. 917). We have recently endorsed and applied *Falsetta* (*People v. Abilez, supra,* 41 Cal.4th at pp. 501–502; see also *People v. Reliford* (2003) 29 Cal.4th 1007 [130 Cal.Rptr.2d 254, 62 P.3d 601] [assuming *Falsetta*'s correctness]), as have the Courts of Appeal (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 703–704 [61 Cal.Rptr.3d 373], and cases cited). In addition, the federal courts follow an analogous rule. (See *U.S. v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1022 [upholding constitutionality of Fed. Rules Evid., rule 414, 28 U.S.C.].)

Although defendant invites this court to reconsider the correctness of *Falsetta*, he proffers no persuasive reason to do so. We thus reject his claim that Evidence Code section 1108 violates due process.

Defendant next argues that even if Evidence Code section 1108 is constitutional, the trial court abused its discretion in admitting evidence of his 1992 crimes against K.K. But as respondent argues, Evidence Code section 1108 expressly reserves the trial court's power to exclude evidence as more prejudicial than probative under Evidence Code section 352, a matter over which the trial court exercises broad discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1197 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) On balance, we cannot say the trial court abused its discretion, as the crimes against K.K. occurred only five years before the L.R. rapes and were relevant to proving the charge that defendant twice raped L.R. Significantly, the crimes against K.K. were quickly proven, thus supporting the trial court's decision

that, under Evidence Code section 352, presentation of the evidence would not consume an undue amount of time or distract the jury from the present charges.[8]

Defendant argues the trial court's decision to admit the evidence was made before the court knew the evidence would include a showing defendant was on parole, had been incarcerated, and had handled a gun right after the first set of sex crimes against K.K. He notes the court itself found this additional evidence "problematic" and argues the court "failed to 'exclude irrelevant though inflammatory details surrounding the offense.' " But defendant never moved to exclude those details and in fact elicited some of them himself. When the trial court opined that it assumed defense counsel's decision to elicit such evidence was a tactical one, counsel did not disagree. We conclude the revelation of defendant's prior incarceration and parole, and his handling of a firearm, was not so significant that we may conclude the trial court abused its discretion in admitting it, especially considering that the defense did not object and the court later instructed the jury the evidence was admitted for a limited purpose. We assume the jury followed this instruction. (*People v. Romo* (1975) 14 Cal.3d 189, 194–195 [121 Cal.Rptr. 111, 534 P.2d 1015].)

Defendant's remaining four subclaims are less substantial. (1) That K.K. declined to press charges and defendant was never convicted of the crimes against her is irrelevant to the question of admissibility, for Evidence Code section 1108 authorizes the admission of evidence not just of convictions but of a defendant's "commission" of prior sex crimes.

(2) Although K.K.'s assertion that she moved back to Finland because she was afraid defendant might kill her was undoubtedly detrimental to his defense, he did not object or request that the answer be stricken or the jury admonished. Accordingly, the matter was forfeited. Moreover, any prejudice was minimized when counsel elicited from K.K. that she had to leave the country in any event because both her airplane ticket and her visa were expiring.

■ (3) Although defendant contends the trial court erred by refusing to permit him to testify and refute K.K.'s testimony without subjecting himself to cross-examination on other topics, it does not appear the court ever made a final ruling in this regard, emphasizing that its ruling was tentative. Because defendant never sought a final ruling, we conclude the present claim was abandoned. (See *People v. Bolin* (1998) 18 Cal.4th 297, 312–313 [75 Cal.Rptr.2d 412, 956 P.2d 374] [change of venue motion].) In any event, the

---

[8] K.K.'s testimony consumed less than an hour.

court did not violate defendant's constitutional rights because he remained free to testify and defend himself against K.K.'s charges. "A defendant who elects to testify does not give up his Fifth Amendment rights nor his corresponding California privilege against self-incrimination (Cal. Const., art. I, § 15) *except as to matters within the scope of relevant cross-examination* [citations]." (*People v. Tealer* (1975) 48 Cal.App.3d 598, 604 [122 Cal.Rptr. 144]; see also *People v. Thornton* (1974) 11 Cal.3d 738, 760 [114 Cal.Rptr. 467, 523 P.2d 267], overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225 [83 Cal.Rptr.2d 533, 973 P.2d 512]; *People v. Ing* (1967) 65 Cal.2d 603, 611 [55 Cal.Rptr. 902, 422 P.2d 590]; 3 Witkin, Cal. Evidence, *supra*, Presentation at Trial, § 233, p. 302.) Though tactically dangerous, because he would still have been subject to cross-examination for bias, interest or motive (*People v. Munoz* (1984) 157 Cal.App.3d 999, 1026 [204 Cal.Rptr. 271]; Simons, Cal. Evidence Manual (2007) § 3.18, p. 215), defendant could have taken the stand and refuted K.K.'s testimony, carefully limiting the scope of his testimony, and then objected to any cross-examination that sought information beyond the scope of his direct testimony.

(4) Defendant contends that even if the introduction of K.K.'s testimony was permissible under Evidence Code section 1108, the evidence of his propensity was sufficiently unreliable that it contravened the need for heightened reliability in capital cases and thus violated his right to due process. (See, e.g., *In re Sakarias* (2005) 35 Cal.4th 140, 160 [25 Cal.Rptr.3d 265, 106 P.3d 931] [noting the need for heightened reliability in capital cases].) But the evidence was relevant to the noncapital part of the case (his rapes of L.R.), not the capital part (his torture and murder of Uwe Durbin). Although K.K.'s evidence was also admitted against him at the penalty phase, the jury was instructed that it must find the crimes against K.K. true beyond a reasonable doubt before considering them as aggravating evidence, thus satisfying any concerns about reliability.

In sum, we find the trial court correctly admitted the evidence of defendant's prior sex crimes against K.K.

### C. *Alleged Prosecutorial Misconduct*

During trial, Michael Durbin testified that defendant had applied bleach to Uwe's wounds, and L.R. testified that she "believed" defendant had applied a blowtorch to Uwe's skin. Defendant contends both points were false and the prosecutor committed misconduct by eliciting the allegedly false testimony, failing to correct it, and emphasizing both points in closing argument. We conclude defendant's failure to object forfeited these claims and that, in any case, the prosecutor did not commit misconduct.

Michael Durbin identified a picture showing a bottle of bleach at the crime scene and stated: "I believe they poured it over my brother, over his cuts." The medical examiner, however, could not confirm whether bleach had been applied to the victim's body, explaining: "I can't tell for sure. There was nothing—bleach is somewhat caustic, but I didn't see anything specific for chemical burns necessarily. But bleach is not necessarily that caustic, so bleach could have been applied and I may not have seen it." In her closing statement, the prosecutor argued that defendant had poured bleach on the victim's wounds to increase the pain. In response, defense counsel reminded the jury that this fact could not be confirmed by the medical examiner, whereupon the prosecutor, in rebuttal, emphasized Michael Durbin's testimony and the fact that an uncapped bottle of bleach had been found at the crime scene.

L.R. testified that when she was in the room next to the victim, "I swear I heard something that sounded like a torch, and I remember thinking to myself, it sounds like he [defendant] was melting the plastic on [the victim's] skin. And I remember hearing Uwe say 'Stop, I'll stop, I'll be quiet, I'll stop.' " On cross-examination, she confirmed she heard a blowtorch but admitted she never saw one. Nor did she actually observe any burn marks on the victim. The medical examiner testified he found no marks on the victim's body that were consistent with injuries from a blowtorch. In closing argument, the prosecutor mentioned L.R.'s testimony about the blowtorch and defense counsel reminded the jury her testimony could not be confirmed by the medical evidence.

To preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection. Failure to do so forfeits the issue for appeal. (*People v. Gray* (2005) 37 Cal.4th 168, 215 [33 Cal.Rptr.3d 451, 118 P.3d 496].) "Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry." (*People v. Visciotti* (1992) 2 Cal.4th 1, 79 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

Because defendant failed to object both to the introduction of the now challenged evidence and also to the prosecutor's closing argument, he forfeited these claims. Defendant contends he was relieved from objecting because any objection would have been futile (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673]), but we disagree. If the evidence was impermissible, defendant should have raised the issue with the trial court, and he presents no reason why an objection would have been futile. His further argument—that objecting would simply have "reinforc[ed] the highly inflammatory details"—would constitute an exception that would

swallow the rule, for that could be true in nearly every case in which a defendant fails to object. We conclude the issue was not properly preserved for appeal.

 Nor would we find reversible error even were we to assume the issue was properly before us. Although "a prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process . . ." (*People v. Sakarias* (2000) 22 Cal.4th 596, 633 [94 Cal.Rptr.2d 17, 995 P.2d 152]), defendant identifies nothing more than a difference of opinion regarding whether the victim's assailants used bleach or a blowtorch. Perhaps Michael Durbin, L.R., or both were mistaken, but that is not the same as false testimony. Perhaps defendant used a blowtorch merely to scare the victim. Perhaps defendant used bleach in a way that would not be detected later, a possibility the medical examiner mentioned. These matters were properly left to the trier of fact to assess.[9] In short, we find no prosecutorial misconduct.

### D. *Allegedly Improper Unanimity Instruction*

The prosecution presented to the jury two theories of criminal liability for murder: defendant was either a direct perpetrator (i.e., he killed Uwe Durbin) or an aider and abettor (i.e., he helped one of the codefendants kill him). The trial court instructed the jury that "[y]ou need not unanimously agree whether a defendant is an aider and abettor or a direct perpetrator, so long as you're convinced beyond a reasonable doubt that he or she was one or the other." Defendant contends this instruction violated his right to heightened reliability of jury decisionmaking in capital cases as required by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. We disagree.

 "It is well settled that, to properly convict, a jury must unanimously agree that the defendant is guilty of the statutory offense of first degree murder beyond a reasonable doubt, but it need not decide which of several proffered theories of first degree murder liability governs the case." (*People v. Lewis* (2001) 25 Cal.4th 610, 654 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Thus, the jury need not decide unanimously whether a defendant was a direct perpetrator or an aider and abettor, so long as it is unanimous that he was one or the other. (*People v. Russo* (2001) 25 Cal.4th 1124, 1133 [108 Cal.Rptr.2d 436, 25 P.3d 641]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1025 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Santamaria* (1994) 8 Cal.4th 903, 918–919 [35 Cal.Rptr.2d 624, 884 P.2d 81].) Nor is such jury unanimity

---

[9] The trial court was apparently convinced, for it mentioned that defendant poured bleach on the victim when it explained why it was denying defendant's motion for a reduced sentence.

required as a matter of federal due process. (*Schad v. Arizona* (1991) 501 U.S. 624 [115 L.Ed.2d 555, 111 S.Ct. 2491] (plur. opn.).)

Although defendant recognizes the force of these precedents, he argues these cases addressed the issue of due process only and asserts we should reach a different result under Eighth Amendment principles "[d]ue to the 'uniqueness' of the death penalty" and the oft-mentioned requirement that capital cases require heightened reliability. (See, e.g., *People v. Bloom* (1989) 48 Cal.3d 1194, 1228 [259 Cal.Rptr. 669, 774 P.2d 698] ["the United States Supreme Court has frequently stated that the Eighth Amendment and evolving standards of societal decency impose a high requirement of reliability on the determination that death is the appropriate penalty in a particular case . . ."].) We are unpersuaded that the absence of a unanimity requirement produces a verdict that satisfies fundamental fairness under the due process clause, yet violates "evolving standards of decency that mark the progress of a maturing society." (*Trop v. Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 78 S.Ct. 590]; see *People v. Moon* (2005) 37 Cal.4th 1, 47 [32 Cal.Rptr.3d 894, 117 P.3d 591].) In any event, undisputed evidence showed the victim died of multiple gunshot wounds and was last seen alive when defendant loaded him into his car and drove away with Phillips in the direction of the Highway 91 freeway, where the body was eventually found. Because the jury sustained the section 12022.5 allegation, it necessarily found beyond a reasonable doubt that defendant personally used a firearm during the commission of the murder. Accordingly, we are confident the jury unanimously found defendant was the direct perpetrator of the killing. Any possible instructional error regarding unanimity was thus harmless under any standard. '

### E. *Allegedly Improper Instruction on Torture*

Defendant was charged with a torture-murder special circumstance, that is, that "[t]he murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) Although the jury sustained this allegation, defendant contends we must vacate this finding because a small discrepancy between the written instructions provided the jury and the instructions read orally to it may have led the jury to sustain the allegation without finding he intended personally to inflict torture.

The jury was provided a written version of CALJIC No. 8.81.18, which provided: "To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved: [¶] 1. The murder was intentional; and [¶] 2. [The] [A] *defendant* intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose[.] [; and [¶] 3. The defendant did in

fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration.][10] [¶] Awareness of pain by the deceased is not a necessary element of torture." (Italics added.) On this written form, the word "The" in part 2 is crossed out.

When the trial court instructed the jury orally, however, it told the jury that to sustain the special circumstance allegation, it must find "[t]he defendant intended to inflict extreme cruel physical pain and suffering . . . ." (Italics added.)

Defendant thus observes the jury was presented with slightly discordant versions of the instruction: The written instruction required it to find "a defendant" intended to torture, whereas the oral instruction required it to find "the defendant" did so. This small discrepancy is critical, he claims, because he and codefendant Phillips were tried together and also because the jury heard that Charone Parker, Norman Culpepper and Michael Woods were active participants in the events that culminated in Uwe Durbin's death. Without a specific finding that he personally intended to torture the victim, defendant claims, the jury may have believed that although he may have participated in the acts of torture, only Phillips, Parker, Culpepper or Woods (or some combination of those four) actually harbored the requisite intent to torture the victim. (See *People v. Petznick* (2003) 114 Cal.App.4th 663, 686 [7 Cal.Rptr.3d 726] [held the phrase "a defendant" could have referred to "any one of the four participants" in the crime (italics omitted)].)

We of course presume "that jurors understand and follow the court's instructions." (*People v. Gray, supra,* 37 Cal.4th at p. 231.) This presumption includes the written instructions. (*People v. Davis* (1995) 10 Cal.4th 463, 542 [41 Cal.Rptr.2d 826, 896 P.2d 119].) To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control. (*People v. Osband* (1996) 13 Cal.4th 622, 717 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Crittenden* (1994) 9 Cal.4th 83, 138 [36 Cal.Rptr.2d 474, 885 P.2d 887].) When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.

---

[10] This third prong was eliminated by Proposition 115 in 1990. (See *People v. Bemore* (2000) 22 Cal.4th 809, 839, fn. 17 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

(*People v. Jablonski* (2006) 37 Cal.4th 774, 831 [38 Cal.Rptr.3d 98, 126 P.3d 938]; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1216 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

■ We agree the written (but not the oral) instruction defining torture in this case was technically erroneous, for the torture-murder special circumstance requires proof that *the defendant himself* intended to torture the victim. (*People v. Davenport* (1985) 41 Cal.3d 247, 271 [221 Cal.Rptr. 794, 710 P.2d 861].) We explained in *Davenport* that although the express words of the special circumstance set forth in section 190.2, subdivision (a)(18) do not require either the intent to kill or to torture, we interpret the statutory language to require such dual intent, both because such meaning is most consistent with the electorate's probable intent in enacting the provision and to ensure the constitutionality of the law. (*Davenport*, at pp. 260–271; *People v. Bemore, supra*, 22 Cal.4th at p. 839.) Thus, to sustain a special circumstance that a killing was committed with torture, it must be proved that "*the defendant* intended to . . . torture the victim . . . ." (*Davenport*, at p. 271, italics added.) The written instructions did not require the jury to make such a finding.

■ Although the written instructions contained a technical error, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) First, the court orally instructed the jury with the correct instruction. Although this court gives priority to the written version of an instruction when a conflict exists between the written and oral versions, the jury is not informed of this rule. It is thus possible the jury followed the oral instruction. Second, there is no indication the jury was aware of the slight difference between the written and oral versions of the instructions, as it asked no questions about this point. Third, the evidence was overwhelming that defendant beat, tortured and killed Uwe Durbin. Two eyewitnesses (Michael Durbin and L.R.), who knew both defendant and the victim, identified defendant and testified, describing his activities the night of the crimes. Their accounts of how defendant beat the victim with the batteries inside the gardener's glove were largely consistent with the injuries the victim sustained. The jury betrayed no confusion, convicting defendant of all charges. "[T]he trier of fact may find intent to torture based on *all* the circumstances surrounding the charged crime . . . ." (*People v. Bemore, supra*, 22 Cal.4th at p. 841.) Finally, considering the other elements of the torture instruction, which the jury necessarily found true— that the murder was intentional and defendant did in fact inflict cruel physical pain and suffering—it would have been impossible on these facts for the jury to have found defendant did not *intend* to torture the victim. Considering all these factors, we conclude the instructional error was harmless beyond a reasonable doubt.

*People v. Petznick, supra,* 114 Cal.App.4th 663, cited by defendant in support, is inapposite. *Petznick,* as here, involved a murder in which several defendants were alleged to have participated. As here, the trial court incorrectly used the indefinite article ("*a* defendant" rather than "*the* defendant") in instructing the jury on the torture-murder special circumstance. The similarity between the two cases, however, ends there. Unlike in this case, the court in *Petznick* did not correctly instruct the jury orally from the bench. Nor, unlike in this case, was there strong evidence in *Petznick* showing the defendant in that case personally intended to torture his victim. The *Petznick* court noted these factors in concluding the error could not be found harmless. (E.g., *id.* at p. 686 [evidence the defendant intended torture not "so overwhelming as to convince us the error was harmless"].) *Petznick* thus does not support a finding the error here was prejudicial.

Although defendant contends the instructional error violated both state law[11] and his constitutional rights to due process and a jury trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, we find the constitutional error was harmless beyond a reasonable doubt (*Neder v. United States* (1999) 527 U.S. 1, 8–12, 15–16 [144 L.Ed.2d 35, 119 S.Ct. 1827]; *Chapman v. California, supra,* 386 U.S. at p. 24) and, a fortiori, the state law error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

### F. *Allegedly Improper Use of CALJIC No. 17.41.1*

Defense counsel, together with the prosecutor, jointly requested the trial court to instruct the jury at the guilt phase with CALJIC No. 17.41.1. The court accordingly instructed the jury that "[t]he integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."

Defendant contends this instruction violated his state and federal constitutional rights. He acknowledges, however, that although in *People v. Engelman* (2002) 28 Cal.4th 436 [121 Cal.Rptr.2d 862, 49 P.3d 209], decided after the

---

[11] Although defendant does not elaborate on the state law point, we assume he means to argue the trial court failed in its duty to instruct on the "general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Coddington* (2000) 23 Cal.4th 529, 592–593 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

trial in this case, we disapproved its use in future trials (*id.* at p. 449), we held that giving the instruction in that case did not violate the defendant's constitutional or statutory rights. Defendant presents no reason why *Engelman* should not control here.

## IV. NONCAPITAL SENTENCING ISSUES

### A. *Firearm-use Enhancement for Rape*

In addition to the death penalty, defendant was sentenced to serve the upper term of eight years for each of his two convictions for forcibly raping L.R. (§ 261, subd. (a)(2)), plus an enhancement term of four years each for his use of a firearm (§ 12022.5, subd. (a)). He contends both enhancements must be vacated for lack of sufficient evidence he used a firearm in connection with the rapes. We disagree.

The standard of appellate review for determining the sufficiency of the evidence is settled. " 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].)' " (*People v. Abilez, supra,* 41 Cal.4th at p. 504.) "Whether a defendant used a firearm in the commission of an enumerated offense is for the trier of fact to decide. (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007 [55 Cal.Rptr.2d 760, 920 P.2d 705].) We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382 [37 Cal.Rptr.2d 596].) Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1058 [40 Cal.Rptr.3d 768].)

 Proof of firearm use during a felony does not require a showing the defendant ever fired a weapon. "Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct *which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies.* 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' (Webster's New Internat. Dict. (3d ed. 1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People v.*

*Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024], italics added.) "Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5[, subdivision] (a)." (*People v. Granado* (1996) 49 Cal.App.4th 317, 325 [56 Cal.Rptr.2d 636]; see *People v. Carrasco, supra*, 137 Cal.App.4th at pp. 1059–1060.)

Nor must the firearm "use" be strictly contemporaneous with the base felony. "In considering whether a gun use occurred, the jury may consider a 'video' of the entire encounter; it is not limited to a 'snapshot' of the moments immediately preceding a sex offense. Thus, a jury could reasonably conclude that although defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued through-out the encounter." (*People v. Masbruch, supra*, 13 Cal.4th at p. 1011.) Accordingly, defendant's jury was instructed that "[a] gun need not be continually displayed during the course of a crime in order for it to be personally used within the meaning of Penal Code section 12022.5, [s]ubdivision (a)."

*Masbruch* is applicable here. Defendant kidnapped L.R. and her family at gunpoint and threatened that if they did not comply with his commands, he would not "hesitate to blow you and your kids away." L.R. was afraid for herself, her boyfriend and her three children, because defendant had a gun. At defendant's house, she heard a gunshot when defendant shot Uwe Durbin in the knee, establishing that defendant's threats were not idle ones. When her boyfriend Michael Durbin protested, she heard defendant tell him to "[s]it down or you're next." Defendant told her his gun contained 16 or 17 bullets. Although the gun was passed around among the codefendants, defendant apparently retained control and access to it, at one point brandishing it. When defendant first raped L.R., in the park, he told her Michael would live if he cooperated, but that Uwe was going to be killed. When he instructed her to take down her pants, she "kept telling him [she] didn't want to die." The second rape occurred in the house where defendant and his confederates were using the gun to hold L.R. and her family. Under these circumstances, the entire "video" of the lengthy criminal encounter between defendant and L.R., beginning with his initial display of the firearm to terrorize her and her family, his threats to use the gun on all of them, and his actual use of it to injure Uwe, is sufficient to prove he used the firearm when he raped L.R. on both occasions.

Defendant argues there was no evidence that at the actual time of either rape he was in actual possession of the gun, but this compartmentalization of the ongoing criminal event improperly attempts to take a "snapshot" of the crime. (*People v. Masbruch, supra,* 13 Cal.4th at p. 1011.) He contends *Masbruch* is distinguishable because, in that case, the defendant used a firearm, bound the two victims, committed other crimes in the house, and then committed sex acts against the victims. "This scenario," defendant claims, "is qualitatively different from the present case where the gun was shared by other people in a location different from the place where the rapes were committed." We agree the fact situation here, where the sex crimes occurred in a location remote from the weapon, is different from that posed in *Masbruch,* but we disagree the jury must necessarily reach a different result. Because there was evidence from which a reasonable jury could find that "the control and fear created by [defendant's] initial firearm display continued throughout the encounter" (*Masbruch,* at p. 1011), we conclude substantial evidence supports the two section 12022.5 firearm enhancements.

## B. *Right to a Jury Determination of Aggravating Sentencing Factors*

For his crimes against L.R., defendant was convicted of two counts of forcible rape with firearm use. (§§ 261, subd. (a)(2), 12022.5.) The trial court sentenced defendant to the upper term of eight years for each count and the middle term of four years for each firearm-use enhancement, and ordered all terms to be served consecutively. Defendant contends the imposition of the upper term for both counts, as well as the court's decision to impose consecutive sentences, violated his right under the Sixth Amendment to the United States Constitution to a jury determination of all critical facts supporting a greater potential sentence. (*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *People v. Black* (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130].) As we explain, even if the trial court erred in imposing the upper term for one of the rape counts, any error was harmless beyond a reasonable doubt.

### 1. *Facts*

The indictment filed March 24, 1998, charged defendant with two counts of having "wilfully and unlawfully, by means of force, violence and fear of immediate and unlawful bodily injury to a person, . . . accomplish[ed] an act of sexual intercourse with and against the will of [L.R.], a female person not his wife" in violation of section 261, subdivision (a)(2). The indictment further charged that in the commission of these crimes, defendant "personally used a firearm, to wit, a HANDGUN, within the meaning of Penal Code sections 12022.5(a) and 1192.7(c)(8)." The jury's verdict stated it found defendant had committed these crimes "as charged" in the indictment and that defendant "did personally use a firearm" in committing those crimes.

At sentencing, the trial court explained its decision to impose the upper term for both rape counts and to have defendant serve the sentences consecutively rather than concurrently: "I do find that the two [rape] counts were committed at separate times and places, one on the kitchen table at the defendant's house and one several hours apart in a vehicle, in a car, with the victim's six-month-old child in the backseat. Between those times, the defendant had ample time to reflect and to cease his behavior, which he did not.

"I, therefore, find that the two rapes were committed on separate occasions, for separate purposes, within the meaning of Penal Code Section 667.6, subdivision (d), and [former rule 426(a)(2) of the California Rules of Court]. There were also separate threats of violence.

"I also make the further finding that as to each separate count of rape, the victim was not raped for sexual reasons, but for purposes of control and abuse to prevent her retaliation or reporting of the events and to intimidate and to sadistically brutalize her.

"While these two rapes did occur during a continuous course of conduct amounting to the kidnapping, which is a special circumstance attached to Count I, they were separate acts with separate intents. Therefore, the Court chooses to impose sentence under [section 667.6, subdivision (d) which, at the time of sentencing, permitted full-term consecutive sentencing for enumerated sex crimes].[12]

"As to [the rape in the kitchen[13]], the Court chooses to impose the upper term of eight years for these reasons:

"The victim was vulnerable. She was in fear for her life. She was unable to resist. She had been accompanied by and separated from her husband [sic] and her three children.

"Secondly, the defendant's criminal background is appalling and shows a history and pattern of increasingly serious and violent conduct.

"Third, the acts showed planning and premeditation. The defendant took the trouble to isolate the victim from her husband [sic] and children, and he took her from behind to demean and debase her.

---

[12] The trial court apparently misspoke and identified subdivision "(e)" as the controlling provision. But the court's reference to "separate acts with separate intents" makes clear it was relying on section 667.6, subdivision (d), which permits full-term consecutive sentences for certain sex crimes "if the crimes involve . . . the same victim on separate occasions."

[13] The trial court mistakenly referred to this count as "Count II." The record shows, however, that the prosecution elected that count II refer to the rape that occurred first in time, i.e., the one in the car.

"I find absolutely no mitigating circumstances, and for that reason, I will impose the upper term of eight years.

"To that term, I will add the mid term of four years for the use of the gun. I don't think the use of the gun in connection with this rape was particularly aggravated, although it was used as a means of coercion and control."

The trial court's reasons for sentencing defendant to an upper, consecutive term for count II, the rape in the car, were almost identical: the vulnerability of the victim, her fear that he would hurt her or her child, defendant's planning and premeditation, and his acts to isolate his victim. For this count, however, the court did not mention defendant's criminal history.

### 2. *Discussion*

■ The United States Supreme Court recently found California's determinate sentencing law (DSL) failed in some respects to accord criminal defendants their Sixth Amendment right to a jury determination of all critical facts supporting an enhanced sentence. As the high court explained: "Under California's DSL, an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance. [Citation.] An element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea, does not qualify as such a circumstance. [Citation.] Instead, aggravating circumstances depend on facts found discretely and solely by the judge. In accord with *Blakely* [*v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]], therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum. 542 U. S., at 303 [124 S.Ct. 2531] ('[T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.' (emphasis in original)). Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, [citation], the DSL violates *Apprendi*'s bright-line rule: *Except for a prior conviction,* 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " (*Cunningham v. California, supra,* 549 U.S. at pp. 288–289 [127 S.Ct. at p. 868], quoting *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348], second italics added.)

■ In *People v. Black, supra,* 41 Cal.4th 799, we determined that—even under *Cunningham*—"so long as a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any

number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury. 'Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.' (*Harris v. United States* (2002) 536 U.S. 545, 558 [153 L.Ed.2d 524, 122 S.Ct. 2406].) Facts considered by trial courts in exercising their discretion within the statutory range of punishment authorized for a crime 'have been the traditional domain of judges; they have not been alleged in the indictment or proved beyond a reasonable doubt. There is no reason to believe that those who framed the Fifth and Sixth Amendments would have thought of them as the elements of the crime.' " (*Id.* at p. 813.) We also reiterated that prior convictions were excepted from the rule of *Apprendi/Blakely/Cunningham* (*Black*, at p. 818; *Blakely v. Washington, supra*, 542 U.S. at p. 301) and in fact found the sentencing court in *Black* did not err by relying in part on the defendant's prior felony convictions to sentence him to the upper term.

We note at the outset that the rules set forth in *Cunningham v. California, supra*, 549 U.S. 270, and *People v. Black, supra*, 41 Cal.4th 799, apply to this case because it was pending on appeal when those decisions were made. (*People v. Amons* (2005) 125 Cal.App.4th 855, 863 [22 Cal.Rptr.3d 908].)

The sentences for the two rape counts require different analyses. Taking the second crime first—count III, the rape of L.R. in the kitchen—the trial court justified its sentence choice of the upper term in part by mentioning that "the defendant's criminal background is appalling and shows a history and pattern of increasingly serious and violent conduct." This evidence was presented in the penalty phase as aggravating evidence and was also available to the trial court from the probation report, which it had read. That report indicated that defendant suffered an uninterrupted history of criminal behavior beginning in 1985, when at the age of 19 he was convicted of receiving stolen property. (§ 496.) Paroled in March 1987, he was convicted less than one year later, in August 1988, of misdemeanor false imprisonment (§ 236) and sentenced to one year in jail. In July 1989, having apparently been released from county jail, he was convicted again, this time of felony possession of a controlled substance while armed with a firearm (Health & Saf. Code, § 11350, subd. (a); Pen. Code, § 12020, subd. (a)). In February 1990, he was convicted of forgery (§ 470), a felony, and sentenced to four years in prison. He was paroled approximately two years later in 1992, but had his parole revoked at least four times in the next four years before finally being discharged from parole in 1997, just a few months before he tortured and murdered Uwe Durbin and raped L.R.

As in *People v. Black*, we conclude this evidence of defendant's criminal history establishes an aggravating circumstance that independently satisfies the Sixth Amendment to the United States Constitution. "The United States Supreme Court consistently has stated that the right to a jury trial does not apply to the fact of a prior conviction. [Citations.] '[R]ecidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence.' " (*People v. Black, supra*, 41 Cal.4th at p. 818.) As we explained in *Black*, rule 4.421(b)(2) of the California Rules of Court provides that it is a circumstance in aggravation if a "defendant's prior convictions as an adult . . . are numerous or of increasing seriousness." Defendant's criminal history adequately proves this point: He began his young adult life with a felony conviction for receiving stolen property, followed immediately by a misdemeanor false imprisonment, then a drug case with a firearm, then a felony forgery with multiple parole violations. It appears that never during all this time did defendant avoid contact with the criminal justice system for more than one year. We conclude the evidence of his criminal history, including his recidivism, satisfies the Sixth Amendment. (*Black*, at pp. 818–820.) The trial court thus did not err in sentencing him to the upper term for count III.

The trial court's decision to sentence defendant to the upper term for count II, the rape in the car, requires a somewhat different analysis because in choosing the upper term the court did not state it was relying on defendant's criminal history. The sentencing court's failure expressly to cite defendant's criminal history as an aggravating factor when sentencing for this crime arguably should make no difference, for his criminal history was the same for both rapes. We need not reach the question of error, however, because even assuming the court erred in sentencing defendant to the upper term on this count, the error was harmless beyond a reasonable doubt. (*People v. Sandoval* (2007) 41 Cal.4th 825, 838 [62 Cal.Rptr.3d 588, 161 P.3d 1146]; *Chapman v. California, supra*, 386 U.S. at p. 24.) To determine whether such error is harmless, we ask "whether, if the question of the existence of an aggravating circumstance or circumstances had been submitted to the jury, the jury's verdict would have authorized the upper term sentence." (*Sandoval*, at p. 838.) More precisely, we must ask whether we can conclude, "beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury." (*Id.* at p. 839.)

Applying that standard here, we conclude any possible *Cunningham/Black* error was harmless beyond a reasonable doubt. In sentencing defendant to an upper term for count II, the trial court mentioned the vulnerability of the victim, her fear that he would hurt her or her child, defendant's planning and premeditation, and his acts to isolate his victim. The first of these factors— the victim's vulnerability—corresponds to rule 4.421(a)(3) of the California

Rules of Court. L.R. testified defendant took her by car to an isolated place with her six-month-old baby in the car. Her other two children and their father, Michael Durbin, were being held at gunpoint in defendant's house. L.R. knew defendant had already shot Uwe Durbin and that his confederates were torturing and would probably kill him. She understandably testified she was afraid for her life.

Defendant had every incentive to dispute this evidence, but his only evidence was his own pretrial statement to police denying that he raped L.R. Other than this out-of-court statement, he presented no evidence suggesting L.R. testified untruthfully. Indeed, the evidence that defendant had, more than once, sexually assaulted his previous fiancée, K.K., tended to support L.R.'s credibility.

The jury was thus presented with a stark choice, and it chose to believe L.R., convicting defendant of rape. Indeed, it convicted defendant of all charges, disbelieving his every denial. Under these circumstances, had the issue of L.R.'s vulnerability or her isolation been tendered to the jury, we conclude beyond a reasonable doubt that the jury, applying the same standard, would have sustained the allegation. Accordingly, the *Cunningham/Black* error with respect to count II was harmless beyond a reasonable doubt.

 Finally, defendant contends the trial court violated his Sixth Amendment rights by sentencing him to serve his sentences consecutively, relying on factors that he neither admitted nor were found true by the jury beyond a reasonable doubt. Because the *Cunningham/Black* rule does not apply to the sentencing choice to impose consecutive rather than concurrent sentences (*People v. Black, supra,* 41 Cal.4th at pp. 820–823), we reject this contention.

## V. PENALTY PHASE

### A. *Discharge of Juror No. 5*

#### 1. *Introduction*

Defendant is African-American. One African-American served on his jury: Juror No. 5. That juror joined the other 11 jurors to convict defendant on all counts at the guilt phase of the trial. Following the presentation of evidence at the penalty phase, the jury retired to deliberate the question of penalty. In the middle of these penalty phase deliberations, Juror No. 1 sent the court a complaint about Juror No. 5. As discussed fully below, a lengthy investigation into the complaint ensued. This investigation, which involved questioning each of the jurors individually, revealed that Juror No. 5, although he had

initially voted for death, changed his mind and was the only juror holding out for a life sentence. He explained his decision, both to the other jurors and to the trial court, as being based on his assessment of the strength of the mitigating evidence showing that defendant had been raised in an extremely dysfunctional family. Juror No. 5 asserted he ultimately found those mitigating circumstances predominated because, being African-American himself and having raised a son, he believed he had some insight into the negative family dynamics and harsh circumstances in which defendant was raised. After its investigation, the trial court—citing multiple reasons—removed Juror No. 5 and replaced him with an alternate juror. The court later removed that juror as well and appointed a second alternate juror. The jury as finally reconstituted eventually sentenced defendant to death.

Defendant contends the trial court's removal of Juror No. 5 violated his right to a fair and impartial jury, as well as a unanimous jury, under the Sixth and Fourteenth Amendments to the United States Constitution. He also contends the court's action violated his rights under section 1089. As we explain, because it was not shown to a demonstrable reality that Juror No. 5 was unable to perform his duty as a juror, the trial court erred under section 1089 in removing him from the jury. This conclusion, based on state law, obviates the need to decide whether removal of Juror No. 5 also violated defendant's constitutional rights. (See *People v. Brown, supra,* 31 Cal.4th at p. 534 [well-established rule requires the resolution of statutory claims before constitutional ones].)

### 2. Facts

#### a. Introduction

The jury began penalty deliberations on March 8, 2000, but did not reach a verdict that day. When the jury retired for the evening, it was split, with two jurors voting for life. At that time, Juror No. 5 had joined nine others in voting for the death penalty. When the jury reconvened the next day, March 9, 2000, the two jurors who had favored a life sentence announced they had changed their minds and would now join the other jurors to return a death verdict. Juror No. 5 announced, however, that he had also changed his mind and now favored life imprisonment. The jury continued deliberations but could not reach a decision by the end of the day, a Thursday. Because the trial court had not usually held trial on Fridays, some of the jurors had made personal plans for that Friday, so the court instructed the jury to return on Monday.

After the other jurors had departed, Juror No. 1 called the clerk and informed her that he had information about possible juror misconduct. The court advised the juror to write down his concerns and submit them to the court the next day.

b. *The Letter*

The following day, Juror No. 1 submitted the following typewritten note to the trial court: "I am a member of [defendant's jury]. I have serious issues of potential jury misconduct, these issues are as follows: One particular juror is basing his conclusions on facts that were not in evidence [i.e.,] coming to his own independent conclusions, because he knows. The same juror has now decided that he is not able to sentence the defendant to death because he just can't do it and when confronted by the other 11 jurors on his reason, because he was asked at the beginning, he has suddenly changed his mind an[d] only offers the fact that we are not 'Black' and would not understand. Correct me if I am wrong but was [B]lack ever an issue.

"The same juror stated that in his opinion life was worse than the death [penalty], again forgive me if I'm wrong but did you not explain things to the contrary[?] This same juror also stated to me something during a couple of breaks, for which we were not suppose[d] to be discussing this info[rmation], and up until now did not make any sense to me until such time as our deliberations began but that this is what you expect when you have no authority figure, this type of behavior and how can you hold someone responsible for their actions, leading me to believe that his mind was made up at the beginning instead of at the end.

"He has been asked if he could consider relevant information and continues with the 'I do not expect you to understand[.'] We are trying your honor but at the present time see no end, sadly enough it is becoming a great source [of] aggravation for all those concerned."

The note was unsigned and contained these handwritten notations: "The juror was also noted to state 'If this guy came from a good family + had a college ed[ucation] then I'd say "burn him[.]" ' But Black people don't admit being abused[.] 'It's a father + son thing. You can't understand—you['re] not Black.' THIS IS IRRELEVANT! + not an issue in deliberations."

Eight additional handwritten notations on the letter, each preceded by a check mark, stated:

"Conclusion not based on fact

"Own ideas of what[']s worse death/life

"Ignoring admonishments

"Using own opinions

"[not] considering of evidence

"[not] following instruc[tions]

"Using Black cultural opinions

"Ignoring Judge[']s instructions."

The trial court summarized the potential problems raised by Juror No. 1's allegations: First, that Juror No. 5 may be relying on facts not in evidence to reach a decision. Second, that Juror No. 5, contrary to his voir dire statements, may not be able to sentence someone to suffer the death penalty. Third, that Juror No. 5 may have been relying on race or racial stereotypes to render a verdict. Fourth, that Juror No. 5 may believe that life imprisonment was a more severe penalty than death. Fifth, that Juror No. 5 may have discussed the case outside the jury room. Sixth, that Juror No. 5 may not be deliberating because he did not expect the other jurors to understand.

After summarizing these concerns, the court opined that it would not investigate the first issue—relying on facts not in evidence—because what Juror No. 5 was accused of doing is "entirely appropriate for discussion in the jury room. There's no misconduct there." Moreover, regarding the handwritten list of eight items, the court stated it did not intend to investigate those either, explaining those were Juror No. 1's conclusions and "That's for us to decide." The parties agreed with the court that the most immediate concern was the discussion of the case outside the jury room.

After discussing the issues with the attorneys, the trial court opined: "I think we narrowed it down really to [these] particular areas: The comments made outside the jury room, the apparent forming of opinions in the guilt phase after only one witness and the attempted transmission of these opinions to other jurors, potentially considering facts not in evidence, and the concern that he believes life is worse than death, which may need an instruction." The court then examined all the jurors individually, beginning with Juror No. 1 and finishing up with Juror No. 5, before deciding to excuse Juror No. 5.

### c. *The Trial Court's Ruling*

The trial court's ruling was extensive, and we quote it here verbatim: "Let me make some factual findings first, because we had a fairly extensive hearing both today and last week.

"First of all, on voir dire [Juror No. 5] said under direct questioning that he would ignore race, and I recall specifically his body language and demeanor and his questionnaire were somewhat evasive. I remember him crossing his arms and glaring under follow-up questioning quite clearly, particularly the issues concerning race and the portions of the questionnaire that he actually failed to complete, and we had to follow up, asking for how he rated himself and so forth. He was extremely evasive, and I do recall that specifically.[14]

"I'm attempting to try and put this into more than one dimension for any court that may look at this subsequently.

"He, nevertheless, did answer the questions, and he did state he would ignore race on voir dire, and the parties didn't challenge or excuse him.

"Second, at the beginning of the guilt phase, according to [Juror No. 1], and largely confirmed by [Juror No. 5] this morning, after the first witness at the guilt phase, on the way out of the courtroom, [Juror No. 5], according to [Juror No. 1], said, 'How can you hold someone responsible for their actions?' [Juror No. 5] doesn't recall that clearly at the moment.

"But then when asked if he said, as [Juror No. 1] said he said, 'This is what you expect when you have no authority figure,' he said he may have said that and he can see himself saying it.

---

[14] The record does not suggest Juror No. 5 was being evasive so much as he misunderstood the nature of the question the court was asking him:

"THE COURT: . . . you didn't tell me [in your questionnaire] what your score was on the scale of one to 10.

"[] JUROR No. 5: No, because . . . the case itself will determine. I have no way of knowing the evidence. I have no way of knowing anything about the case, so how could I possibly give a score of one to 10 not knowing anything about the case?

"THE COURT: Absolutely. I totally agree with you. But the question asked you to rate how you feel about the death penalty now, not knowing anything about the case in the abstract.

"Is it something you think is a good thing for society? A bad thing? Do you favor it in the appropriate case, or do you not?

"[] JUROR No. 5: Perhaps it could. Again, it's the nature of the case that will determine it. I could go along with whatever decisions that are made.

"THE COURT: Well, you're going to be the one making them. That's why we're asking you these questions.

"[] JUROR No. 5: Yes.

"THE COURT: And we don't want you to go along with anybody else if you disagree.

"[] JUROR No. 5: No, not anyone else's decision, but the evidence of the case will determine what I do. That's what I'm trying to say.

"THE COURT: Oh, absolutely for everybody. But forget about this case, all right. I've met you at a cocktail party, we're discussing the death penalty. How do you feel about it . . . .

"[] JUROR No. 5: I think I'm in favor of the death penalty. I am.

"THE COURT: Okay. On a scale of one to 10, how much in favor of it are you?

"[] JUROR No. 5: I would put it around a seven."

"I find [Juror No. 1] completely credible, and he's largely confirmed by [Juror No. 5]. So there is no doubt in my mind that between the first and second witnesses in the guilt phase, that is between Mr. Michael Durbin's testimony and [L.R.'s] testimony, or thereabouts, that on the way out of the courtroom, and apparently unheard by other jurors, he made those comments. So that is my factual finding on that issue.

"With respect to the questions that I asked the individual jurors this morning, we had some splits, but [Juror No. 5] largely confirmed that he made the statements that were attributed to him by [Juror No. 1]. So I do make factual findings that during the relatively brief six hours of deliberations [Juror No. 5] did make the following statements.

" 'You don't understand because you're not black.' 'You can't understand because you're not black.' And when asked if he could consider relevant information, he said, 'I don't expect you to understand; you're not black.' 'Black people don't admit being abused.' 'Black kids have a different relationship with their fathers.' He discussed the fact that a black father, in the context—a racial context—is an authority figure in the black family. Again, in a racial context.

"He said, 'This is a cultural thing,' with respect to race and behavior. He said, 'I know more went on, more went on than we were shown,' in the context of the discussions about abuse of the defendant as a child or a young man.

"When asked to give reasons for his decision, possibly his sentencing decision, he said to the other jurors that they are not black and would not understand. And when asked by the other jurors to show them proof based on the facts they heard in court, I do find despite his denial that he said words to the effect of, 'Because I know; this is a black thing.' He denied saying that, but five jurors said he said it, four said he did not, and two were unsure. I find that he did say that or something similar in that context.

"With respect to the statements that he denied saying about life without possibility of parole, I'm satisfied that he understands and can follow an instruction that death is worse. In the context of the statements he's alleged to have made, I think he probably did make those statements. I don't believe he thinks that at this point, based on his statements and all the other evidence I've heard, or that he's unable to follow that kind of an instruction.

"I'm not unmindful of the facts that [defense counsel] has brought up, that both [Juror No. 5 and No. 1] confirmed that [Juror No. 5] said in essence . . . that if the defendant was privileged and educated and came from a good family he might make a different decision.

"My problem, quite frankly, at this point is that these statements apparently are so entangled with race-based assumptions, which [Juror No. 5] himself doesn't appear to recognize, that I fear it's too much to ask him to attempt, to disentangle the permissible, the entirely permissible from the totally impermissible. I don't think he's capable of doing it. I think it's a shame, because I think he's otherwise a good juror, but I don't think he's able to disentangle his race-based assumptions from those that are not race based.

"The law is basically that jurors at the penalty phase are required to exercise their discretion based on the evidence heard in court. They're guided by their instructions, as delineated by [section 190.3,] factors (a) through (k). Nowhere in the law, even under factor (k), is a juror permitted to base his decision on previously undisclosed prejudgments, preconceptions about human behavior, which further are classified by racial category, particularly in a trial where race has not been an issue in any way, shape or form. And we have heard no evidence whatsoever about race-based differences in behavior, in character or otherwise, other than adoption practices in the [19]40's . . . .

"[Juror No. 5], I find, concealed his racial biases and fundamental belief in racial stereotypes on voir dire. He did say he would not base his decision on or consider race, but I find that he's unable to do that.

"Second, by attempting to communicate with [Juror No. 1] after the first guilt phase witness, Michael Durbin, I find that he began to reveal his fundamental biases and prejudices, because I find that he made unfounded assumptions about the defendant and authority figures when at that time he had absolutely no evidence of such. He—as I said before, he didn't even have the benefit of the defense's opening statement in which they referenced such things.

"He then repeated those phrases, or something similar, in the penalty phase deliberations, which indicates that he was just carrying through his prejudgment of whatever he was going to do in the penalty phase.

"Taken together with his generalizations and other expressions of racial stereotyping, which are too numerous to repeat at this time, I think the inescapable conclusion is that [Juror No. 5] is exhibiting a fundamental racial bias and improperly considering race in contradiction of his instructions and statements on voir dire.

"I don't think [Juror No. 5] is capable of dealing with this or setting aside—setting it aside because he doesn't appear to recognize it. He made statements indicating that he considered life without possibility of parole worse than death, although the credibility of such statements in this context is open to question, and he says he can follow the law in this respect. I believe he will.

"[Juror No. 5] did make numerous statements about race-based stereotypes and behavior that weren't based in any evidence presented to the jury. As I said, this is indicative of a fundamental bias that he's unable to set aside. He admitted most of them, and he doesn't appear to recognize that these are expressions of stereotyping and bias and prejudice.

"So I find he's committed misconduct in that he's failed to follow his oath as a juror, he failed to disclose his biases, including race-based biases on voir dire, he failed to follow his instructions in stating that he considered life without possibility of parole as worse than death and by engaging in speculation that there was more evidence that the jury wasn't told, by utilizing race-based biases which find no basis in the evidence, by prejudging the appropriate penalty, apparently beginning to do that after only the first guilt phase witness, in clear contradiction of his instructions, and by using sweeping generalizations and stereotypes about human behavior that are based on racial assumptions and not on the evidence.

"And let me conclude by saying that to permit jurors to base their decision as to whether a person should live or die on biases and prejudices that are based on race, as I said previously, contravenes everything that we know and everything that our Constitution is about. It's unconstitutional. It violates the equal protection clause of both the State and Federal Constitution, and it invades due process for this reason, because if jurors were permitted to vote for life or death based on racial stereotyping not found in the evidence presented to them, imposition of life or death would depend on the racial composition of the jury and the race of the defendant, and it would, therefore, be arbitrary and capricious.

"And so, for all of these reasons, I am going to excuse [Juror No. 5]."

### 3. *Section 1089*

Section 1089, at the time of defendant's trial, stated in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause shown to the court* is found to be unable to perform his duty, . . . the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors." (Stats. 1963, ch. 721, § 2, p. 1729, italics added.)[15] The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced,

---

[15] The statute is substantively identical today, although it has been amended twice since defendant's trial. The Legislature made the quoted passage gender neutral in 2002. (Stats. 2002, ch. 784, § 545.)

" 'does not offend constitutional proscriptions.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1410 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

Although we have previously indicated that a trial court's decision to remove a juror pursuant to section 1089 is reviewed on appeal for abuse of discretion (see, e.g., *People v. Leonard, supra*, 40 Cal.4th at p. 1409), we have since clarified that a somewhat stronger showing than what is ordinarily implied by that standard of review is required. Thus, a juror's inability to perform as a juror must be shown as a "demonstrable reality" (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 [106 Cal.Rptr.2d 313, 21 P.3d 1225]), which requires a "stronger evidentiary showing than mere substantial evidence" (*id.* at p. 488 (conc. opn. of Werdegar, J.)). As we recently explained in *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 [63 Cal.Rptr.3d 82, 162 P.3d 596]: "To dispel any lingering uncertainty, we explicitly hold that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury."

### 4. *Concealment on Voir Dire*

We address first the trial court's conclusion that Juror No. 5 concealed his racial bias on voir dire. As we explain, any concealment was unintentional and was insufficient to justify excusing him from the jury in the middle of penalty phase deliberations.

#### a. *Facts*

Juror No. 5 filled out his written jury questionnaire; it did not ask him whether he would treat defendant differently because of their shared racial heritage, although the juror did indicate there was nothing about defendant's "appearance" that would bias him one way or the other. On voir dire, the following took place:

"THE COURT: Okay. Obviously the defendant is African-American. So are you. Do you think that's going to affect you in any way?

"[] JUROR No. 5: No.

"THE COURT: Are you going to cut him—as one juror said to me when I was struggling to find words to express this thought, 'She means are you going to cut him slack.' Are you going to cut him slack?

"[] JUROR No. 5: No.

"THE COURT: Okay. Are you going to be harder on him because he's African-American?

"[] JUROR No. 5: No.

"THE COURT: You'll treat him the same as anyone else?

"[] JUROR No. 5: That is correct."

It was during this interaction that the trial court, when it later excused Juror No. 5, said that the juror's "body language and demeanor and his question-naire were somewhat evasive. I remember him crossing his arms and glaring under follow-up questioning quite clearly."

During the investigation the trial court undertook in the middle of the penalty phase deliberations, the court asked Juror No. 5 to recall the questioning on voir dire before trial when he had been asked "whether the fact that the defendant was African-American, black, would affect [him] in any way," and he had answered in the negative. He affirmed that he had not changed his mind since that time. He explained his position: "My son has had everything that an individual would need to . . . come up in this society. He's had a mom and a dad, the—all the schools provided, all of the nurturing that a person should have, and if he would make the kind of mistake that was made, I would have no idea as to what decision I would make." He affirmed that he had promised before trial that he would not treat defendant differently due to his race and had not made any statements in the jury room indicating he had gone back on that promise. He agreed that he could follow an instruction that he must "set aside bias and prejudice based on race, racial stereotypes and generalizations based on conjecture."

b. *Discussion*

A criminal defendant has a constitutional right to an impartial jury, and the pretrial voir dire process is important because it enables the trial court and the parties to determine whether a prospective juror is unbiased and both can and will follow the law. But the voir dire process works only if jurors answer questions truthfully. "As the United States Supreme Court has stated, '*Voir dire* examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.' [Citation.] [¶] A juror who

conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct." (*In re Hitchings* (1993) 6 Cal.4th 97, 110–111 [24 Cal.Rptr.2d 74, 860 P.2d 466], fn. omitted.)

"Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is unable to perform his duty.' " (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175 [9 Cal.Rptr.2d 834, 832 P.2d 146]; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 644 [21 Cal.Rptr.3d 612, 101 P.3d 509] [quoting *McPeters* with approval].)

The record fails to demonstrate that Juror No. 5 concealed anything. He was never asked whether he would interpret evidence of any abuse defendant may have suffered as a child through the prism of his own experiences; indeed, we expect jurors to use their own life experiences when evaluating the evidence. (See *People v. Bell* (1989) 49 Cal.3d 502, 564 [262 Cal.Rptr. 1, 778 P.2d 129] [" '[I]n our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; . . . it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups . . . .' "].)

Juror No. 5 affirmed during voir dire that he would not consider defendant's race to benefit or disadvantage him and that he would treat him like he would anyone else. When questioned during the penalty phase, he affirmed his views, explaining that he viewed the mitigating evidence favorably because defendant came from a broken, disadvantaged family, not simply because he was African-American. He suggested that had defendant enjoyed the benefits his own son had growing up, he would consider death as a possible penalty for defendant's crimes. Under these circumstances, it is difficult to see what Juror No. 5 concealed.

The trial court apparently concluded that Juror No. 5 had concealed certain race-based assumptions regarding the nature of family dynamics in African-American families, especially with regard to young men who grow up without strong positive male role models. But Juror No. 5 was never asked about that subject. Moreover, failure to express his views about African-American family dynamics is not the kind of concealment that would justify

Juror No. 5's removal from the jury under section 1089, i.e., something showing "good cause" he was *"unable* to perform his . . . duty [as a juror]." (Italics added.) To conclude otherwise would require accepting the notion that *the other jurors* were unable to perform *their* duty because they concealed *their* unstated assumption that the family dynamics in African-American families were no different from those occurring in non-African-American families, or that young males who grow up fatherless in Black families have exactly the same problems as young men raised without fathers in White, Hispanic or Asian families. We do not purport to resolve these questions, which are more in the realm of sociology and psychology, but we can and do conclude that Juror No. 5 did not *conceal* his views on the subject because he was never asked about them.

Even were we to assume Juror No. 5 concealed his intention to consider his own personal knowledge and experience of African-American families when evaluating the mitigating evidence, any such concealment was clearly unintentional. The trial court plainly found Juror No. 5 was himself unaware of his own allegedly race-based assumptions and thus would be unable to "disentangle" those allegedly impermissible views from those that he could properly consider. If Juror No. 5 was unaware of his own views, he certainly cannot be held to have *intentionally* concealed them.

Would such unintentional concealment constitute good cause to believe Juror No. 5 was unable to perform his duty under section 1089? (*People v. McPeters, supra,* 2 Cal.4th at p. 1175.) We conclude not. Although the decision to remove a juror on such grounds is committed to the discretion of trial courts in the first instance, as noted, we review such decisions by asking whether the grounds for such removal appear in the record to a demonstrable reality. (*People v. Barnwell, supra,* 41 Cal.4th at p. 1052.)

Considering all the circumstances, any unintentional concealment here does not establish *to a demonstrable reality* that Juror No. 5 was unable to perform his duty as a juror. "The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts . . . does not constitute a refusal to deliberate and is not a ground for discharge." (*People v. Cleveland, supra,* 25 Cal.4th at p. 485.) It appears that Juror No. 5 "simply viewed the evidence differently from the way the rest of the jury viewed it." (*Id.* at p. 486.) Juror No. 5's particular view of the evidence, refracted through the prism of his own experience as an African-American man who had raised a son, showed neither a refusal to deliberate nor an inability to perform his duty as a juror *to a demonstrable reality. (People v. Barnwell, supra,* 41 Cal.4th at p. 1052.)

Accordingly, to the extent the trial court relied on an alleged unintentional concealment during voir dire as a ground to dismiss Juror No. 5 in the middle of the penalty phase deliberations, it erred.

### 5. *Reliance on Facts Not in Evidence*

In excusing Juror No. 5, the trial court also cited his reliance on facts not in evidence. As we explain, the trial court erred because Juror No. 5 was merely relying on his life experiences to interpret the evidence presented.

#### a. *Facts*

Although the court had indicated initially that it would not investigate this topic, it asked Juror No. 1 about the issue. Juror No. 1 replied: "We all feel that he has [discussed facts not in evidence]. We asked him, 'Show us proof,' for which he couldn't do that. He said, 'I know what all goes on, because . . . this is a black thing.' " The court asked Juror No. 1 what particular facts he believed Juror No. 5 was relying on that were outside the record.[16] Juror No. 1 answered that Juror No. 5 did not "produce" any facts outside the record but that Juror No. 5 believed that defendant must have suffered more abuse than was shown at the penalty phase. When the other jurors asked the basis of his belief, Juror No. 5 said: " 'I know more went on' " and " 'I don't expect you all to understand.' "

Asked whether Juror No. 5's beliefs were based on defendant's race, Juror No. 1 responded that Juror No. 5 did not rely on race "in so many words" but said it was "a cultural thing, and that black kids have a different relationship with their fathers, and you have to understand all of this, and he's not responsible for what he's done. [¶] It was just going off in some sort of nonsensical tangent, and there was no control over trying to get him to veer from veering off into it. He was confusing everyone, and everybody was getting extremely frustrated."

Juror No. 12, the jury's foreperson, told a slightly different story. Asked whether she had heard statements suggesting Juror No. 5 was relying on racial considerations rather than the evidence, Juror No. 12 replied: "That's not the way it was stated. Yet, speaking on behalf of several of us that have discussed it, we feel that [Juror No. 5's position] wasn't based on the law. The decision that was made wasn't based on the law or the evidence." Asked to elaborate, the foreperson said that Juror No. 5 was giving defendant the benefit of a doubt that to the other jurors did not appear to be based on the

---

[16] At this point, the prosecutor suggested at sidebar that the court's questioning was straying into an impermissible inquiry about the jury's thought processes, but the court disagreed.

evidence. Juror No. 2 and Juror No. 11 also remembered Juror No. 5 saying he was giving defendant the benefit of the doubt, but that his view was not based on race but on the fact that defendant "had grown up in circumstances that were less than ideal."

Juror No. 12 said that the other jurors tried to get Juror No. 5 to explain his vote, but they did not understand his reasons. His reasons did not appear racial, but neither did they seem, to Juror No. 12, to be based "on the law." "We . . . tried to reason with him in other ways, but he just kept going back to [defendant's] background. *Not the black issue, but background. It wasn't the race that kept coming up like that.*" (Italics added.)

Juror No. 2 reported that two of the female jurors stated during deliberations that perhaps Juror No. 5's reasoning was based on race but that he "refuted the comment," saying "it had nothing to do with race." Juror No. 2 did not hear Juror No. 5 make any comments that indicated he was relying on racial considerations.

Juror No. 12 recalled that, speaking of the absence of a role model in defendant's life, Juror No. 5 had said at one point that " 'You don't understand because you're not black,' " and he had pointed out that the other jurors had not been "raised in a black family, and that in a black family you look up to the male." Juror No. 11 corroborated this account, reporting that Juror No. 5 had emphasized the absence of a "strong father figure" in defendant's life and had asserted the other jurors would not understand, and that he would not expect them to understand, because they were not African-American. Juror No. 9 confirmed that Juror No. 5 had said that the other jurors *did not* understand "how it was for black kids" and that they *could not* understand. Juror No. 3 agreed. Jurors Nos. 2, 3, 7 and 8 all reported that Juror No. 5 had said that the other jurors would not understand because they were not African-American. Juror No. 7 qualified her answer, saying that she did not see Juror No. 5's comment "as being racial-based, per se, just more of what he felt inside of him." Juror No. 5 himself acknowledged he "may have said that."

By contrast, neither Juror No. 4 nor Juror No. 10 heard Juror No. 5 make any such comments.

The trial court asked all the jurors whether Juror No. 5 had said that " 'Black kids have a different relationship with their fathers.' " Juror No. 12 agreed that he had said that, as did several other jurors. Juror No. 5 himself admitted saying it. The relative value of one's family in various minority cultures was discussed by other jurors, according to Juror No. 12; for example, they discussed how "Mexican families are close and everybody

looks up to their parents. So culture came into it, but I don't know if it was from [Juror No. 5]." Jurors Nos. 7, 8 and 9 confirmed that Juror No. 5 asserted that it was not so much a racial as a cultural point he was making, but Jurors Nos. 2, 3 and 4 did not hear that comment. Juror No. 7 recalled that Juror No. 5 had said that African-American men do not show their feelings so easily. Juror No. 5 agreed that "with respect to racial issues and behavior," he had said " 'This is a cultural thing.' "

Asked whether Juror No. 5 had "[made] the statement, 'Black people don't admit being abused,' " Juror No. 12 said that he "might" have made such a comment, while Jurors Nos. 2, 3, 7, 8 and 11 all reported that Juror No. 5 had made the statement. Juror No. 5 agreed he had done so.

By contrast, neither Juror No. 4 nor Juror No. 9 recalled Juror No. 5 making such a statement.

Asked whether Juror No. 5 had said that " 'I know more [abuse] went on; more went on than we were shown,' " Juror No. 12 replied that she thought "that was said and not just by him." "[E]verybody was speculating about all kinds of things," and she considered contacting the trial court to report that some jurors were relying on facts that had not been presented in evidence. Ultimately, however, Juror No. 12 just tried to focus the jury on the issues at hand. By contrast, Jurors Nos. 3, 4, 7, 9 and 11 did not hear Juror No. 5 say he believed more abuse had occurred than was shown. Juror No. 8 was not sure, whereas Juror No. 2 heard the comment but did not know whether Juror No. 5 or some other juror had made it. Juror No. 5 did not remember making such a statement, but admitted that he "could have."

Asked to address whether Juror No. 5 had said he believed defendant had suffered more abuse than was shown by the evidence, Juror No. 10 had a more complicated response: "I remember me saying, 'A lot of kids from abused homes are not so easy to come forward with that information.' I remember myself saying that. It didn't have anything to do with race. That's everybody. And I'm trying to think of what [Juror No. 5] might have said. [¶] I think we were talking about the point that he had made about how black kids look up to their dads, he might have said something to the effect, and they don't like to—let me think. I can't really remember him saying anything like that, I'll be honest with you." She later admitted that Juror No. 5 had said, " 'Black kids have a different relationship with their fathers' " and that more abuse probably occurred than was documented at trial.

Asked whether Juror No. 5 gave as his reason for voting for life "that the other jurors are not black and would not understand," Juror No. 12 answered in the negative: "I don't think that was his reason necessarily." Instead, his

reasoning was opaque to her. Juror No. 3 thought that was the gist of Juror No. 5's reasoning, but could not recall the exact words used. Juror No. 4 reported that Juror No. 5 had said "something like that." Juror No. 5 himself stated that he did not recall making that statement but, when pressed by the trial court, admitted he could have made it.

Asked whether, when asked to show proof of his vote for life imprisonment, Juror No. 5 had told the jury, " 'Because I know; this is a black thing,' " Jurors Nos. 4, 7, 8, 10 and 12 did not recall him making such a statement. Juror No. 5 himself denied doing so. By contrast, both Jurors Nos. 2 and 11 heard Juror No. 5 justify his vote for life by saying, "Because I know; this is a black thing," and Juror No. 3 recalled that Juror No. 5 had made comments to that effect.

Juror No. 12 reiterated that Juror No. 5 had mentioned race when discussing defendant's background, but not in connection with other aspects of the case. Juror No. 10 also opined that she did not take Juror No. 5's comments to be racial.

Asked whether Juror No. 5 was relying on defendant's race during penalty phase deliberations, Juror No. 6 replied that "[h]e did not come right out and say it in that manner. He was talking about family and that we did not understand how important the father figure was in a black family. And then he went on to talk about his own [family], and that in any situation, if you do not have a good family, and especially a man with that, have a good family, that that was very important in how he leaned toward his verdict." She agreed that Juror No. 5 had made the statements " 'You don't understand because you're not black,' " " 'Black people don't admit being abused,' " and " 'Black kids have a different relationship with their fathers,' " but also agreed with the court's suggestion that he had made these statements in the context of his "perspective on black culture rather than basing his decision on the fact that the defendant is black."

Juror No. 6 did not recall Juror No. 5 saying he knew there was more evidence of abuse than was shown to the jury, nor that the other jurors would not understand his reasons for voting for life because they were not Black.

Juror No. 9 agreed that Juror No. 5 had "participate[d] in deliberations by discussing the evidence without reference to race." Jurors Nos. 2 and 4 also agreed, as did Juror No. 7, who explained that although the issue of race came up, "[m]ost of the time" Juror No. 5 deliberated without reference to race. She elaborated: "I never got the feeling that [Juror No. 5] was necessarily more biased if it would have been a white man than a black man. I believe that he feels that he can identify more with [defendant] than he

thinks we can. That was my impression." Juror No. 1, who made the initial complaint, agreed that Juror No. 5 had deliberated during the penalty phase without reference to race some of the time. Juror No. 1 believed that it was inappropriate to consider "social/economic" beliefs, the factual basis for which "weren't even introduced as evidence."

By contrast, Juror No. 8 said that Juror No. 5 always referred back to race during deliberations. Juror No. 3 affirmed that Juror No. 5 referred to race "quite frequently in his comments." Juror No. 5 was the only juror who brought up the issue of race.

### b. *Discussion*

■ Courts should exercise caution when undertaking inquiries that threaten to trench on the sanctity of jury deliberations, for the preservation of secrecy during deliberations fosters an atmosphere conducive to a frank and open discussion of the issues among jurors. Ensuring such secrecy also insulates the jury from improper influence that could be brought to bear by outside forces and supports the stability of jury verdicts. (*People v. Cleveland, supra*, 25 Cal.4th at pp. 475–476.) These important concerns do not, however, preclude the trial court from conducting a reasonable inquiry when faced with allegations of jury misconduct. (*Id.* at p. 476.)

■ "A jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters." (*People v. Leonard, supra*, 40 Cal.4th at p. 1414.) A juror commits misconduct if the juror conducts an independent investigation of the facts (*Lankster v. Alpha Beta Co.* (1993) 15 Cal.App.4th 678 [18 Cal.Rptr.2d 923] [measuring something at stores similar to the scene of the accident]), brings outside evidence into the jury room (*Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314 [276 Cal.Rptr. 430] [consulting a dictionary]), injects the juror's own expertise into the deliberations (*In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260] [former police officer telling other jurors he knew the law]), or engages in an experiment that produces new evidence (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1746 [286 Cal.Rptr. 435] [conducting an experiment regarding the pouring of concrete]). "Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. [Citations.] 'The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. . . . [¶] In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from

the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' (*Turner v. Louisiana* (1965) 379 U.S. 466, 472–473 [13 L.Ed.2d 424, 85 S.Ct. 546], citations and fn. omitted.) As the United States Supreme Court has explained: 'Due process means a jury *capable and willing to decide the case solely on the evidence before it* . . . .' (*Smith v. Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78, 102 S.Ct. 940], italics added . . . .)" (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87].)

 ▮ That the alleged problems with Juror No. 5 arose during deliberations at the penalty phase rather than the guilt phase is significant. Rather than the factfinding function undertaken by the jury at the guilt phase, "the sentencing function [at the penalty phase] is inherently moral and normative, not factual; the sentencer's power and discretion . . . is to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113].) Given the jury's function at the penalty phase under our capital sentencing scheme, for a juror to interpret evidence based on his or her own life experiences is not misconduct. "Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work." (*In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal.Rptr.2d 281, 911 P.2d 468].) "[D]uring the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations. . . . [¶] A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266 [120 Cal.Rptr.2d 432, 47 P.3d 225].) "[T]he jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution." (*In re Hamilton* (1999) 20 Cal.4th 273, 296 [84 Cal.Rptr.2d 403, 975 P.2d 600].)

Applying these rules to the facts of this case, while giving full deference to the trial court's factual findings, we conclude the evidence does not show to a demonstrable reality that Juror No. 5 was relying on facts not in evidence or that he was otherwise unable to fulfill his oath and duty as a juror. (§ 1089.) As is apparent, Juror No. 5 mentioned defendant's race during penalty phase deliberations, and the jurors discussed a variety of issues connected to defendant's family background. This was understandable, inasmuch as the defense case in mitigation consisted entirely of evidence of defendant's shockingly frequent physical abuse as a child growing up. It is not the typical

American family in which a child is conceived by his father's rape of his mother when she was a preteen, the child's father is convicted of rape and attempted murder and sent to prison, the child's stepfather is similarly tried for murder, and the child's stepfather beats the child to the point where the child suffers convulsions.

As an African-American man who had raised a son, Juror No. 5 believed he had some insight into these family dynamics, and those insights led him to conclude that because the circumstances of defendant's childhood sufficiently outweighed the aggravating evidence, defendant did not deserve the death penalty. In other words, based on the juror's life experiences, he weighed the mitigating evidence more heavily than did the other jurors. Juror No. 5's personal assessment concerning what constituted mitigation, what was worthy of sympathy or compassion, and the weight such evidence deserved, is exactly what was at stake in the penalty phase.

■ The record does not demonstrate Juror No. 5's personal evaluation of the evidence was the product of improper racial considerations any more than the non-Black jurors' rejection of his evaluation was influenced by their personal racial views regarding the dynamics of an African-American family. Indeed, that the jurors themselves perceived the issue was not solely one of race is indicated by the reports of some that Juror No. 5's reasoning was based not on race but on cultural differences, leading the jury to undertake a discussion about the family dynamics they believed typical of other racial and ethnic groups. A juror whose personal view was that African-American defendants *never* should, or *always* should, receive the death penalty commits clear misconduct, both by not considering the particular facts of the case and by making the penalty decision based on racial bias. It would be equally objectionable were a juror to conclude *a particular defendant* deserved the death penalty or life imprisonment because of his or her race. But relying on an understanding, based on personal experience, of the effects of certain social environments and family dynamics on a young person growing up, when this understanding illuminates the significance or weight an individual juror would accord to related evidence in a particular case, is not misconduct.

Nor was Juror No. 5's statement that he "knows" more abuse occurred than was presented to the jury an instance of relying on facts not in evidence. Juror No. 5 did not conduct an improper experiment, visit the crime scene by himself, or consult a dictionary. He merely drew an inference from the evidence presented, drawn from his own life experiences, that more abuse probably occurred than was shown. That inference was permissible. *People v. Yeoman* (2003) 31 Cal.4th 93 [2 Cal.Rptr.3d 186, 72 P.3d 1166] is illustrative. In that case, jurors used their own life experiences with drug abuse to evaluate trial evidence from a defense expert regarding the defendant's drug

use and its alleged effect on his behavior. We found no misconduct, explaining that " '[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.' " (*Id.* at p. 162.) If jurors can properly draw on their personal and family experiences with drug abuse, it follows they can draw on their personal and family experiences within their own minority communities.

Seen in this light, Juror No. 5's statement that the other jurors would not understand because they were not Black merely meant that they did not share his personal experiences growing up in an African-American family. No juror presented evidence that Juror No. 5 failed or declined to deliberate, and the evidence was in fact the opposite: he tried to explain his position on this issue and to describe to the other jurors his own experiences in an African-American family. Although the other jurors did not always understand or agree with his arguments, a juror's reliance on " 'faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge.' " (*People v. Barnwell, supra,* 41 Cal.4th at p. 1051, quoting *People v. Cleveland, supra,* 25 Cal.4th at p. 485.)

We conclude that, even giving full deference to the trial court's factual findings, the evidence does not show *to a demonstrable reality* that Juror No. 5 relied on facts not in evidence. Accordingly, there is no basis on which to conclude he was unable or unwilling to fulfill his oath and duty as a juror, justifying his removal from the jury. (§ 1089.) The trial court thus erred to the extent it relied on this ground to discharge Juror No. 5 from the jury.

### 6. *Refusal to Follow Instruction That Death Is Worse Than Life*

As an additional reason justifying its decision to excuse Juror No. 5, the trial court opined that the juror "committed misconduct in that he's failed to follow . . . [its] instructions in stating that he considered life without possibility of parole as worse than death." As we explain, the record fails to show as a "demonstrable reality" (*People v. Cleveland, supra,* 25 Cal.4th at p. 474) that Juror No. 5 was "unable to perform his . . . duty" (§ 1089) on this ground.

#### a. *Facts*

Following Juror No. 1's written complaint, the trial court asked him to address his allegation that Juror No. 5 had said he believed life imprisonment was worse than death. Juror No. 1 replied: "His exact comment was, 'Who are we to say what's worse?' And the foreman of the jury said, 'The judge instructed you by law which one was considered worse.' And he said, 'It all comes down to just your matter of opinion.' " Juror No. 1 continued:

"Everybody was under the impression [Juror No. 5] was changing his direction, because he now thinks that [life imprisonment] was worse. His exact comment was, 'I want this guy to sit in jail for the rest of his life and think about what he's done, because I think that's the worse of the two.' "

Regarding whether Juror No. 5 could impose the death penalty, Juror No. 1 stated: "[H]e 'just can't do it.' He can't see within himself to do it. And the other jurors asked him, 'You were asked at the beginning of this trial,' and he basically said, 'I don't expect you all to see where I'm coming from.' We said, 'This is not a matter of making us understand. You have to show us something.' " Juror No. 5 did not feel this way about all defendants, but just this defendant.

Both Juror No. 2 and Juror No. 12 agreed that Juror No. 5 had said he wanted defendant to sit in jail for the rest of his life and think about his crimes. Juror No. 12 did not, however, recall that Juror No. 5 had said life imprisonment was worse than death and in fact concluded, "I think he knows that one is harsher than the other." Juror No. 2 thought it was possible Juror No. 5 had said that life was worse than death, but could not recall. Juror No. 3 was more definite, reporting that Juror No. 5 "absolutely" said that defendant should be imprisoned for life because life was the more severe penalty. By contrast, Juror No. 9 never heard Juror No. 5 say that life was worse than death. Juror No. 8 suggested that he heard something to that effect, but ultimately concluded that Juror No. 5 never made such a comment.

Juror No. 4's recollection of the issue was inconsistent. When first asked whether Juror No. 5 had stated that life imprisonment was "a worse punishment than death," he replied that Juror No. 5 "didn't say that." But when asked whether Juror No. 5 had said, " 'Who are we to say what's worse?' " and that defendant should " 'sit in jail for the rest of his life and think about it because that's the worse of the two,' " Juror No. 4 agreed that Juror No. 5 had said "[s]omething like that."

Juror No. 6 reported that Juror No. 5 had said that life imprisonment was worse than death, but qualified the statement, saying that his belief went beyond defendant's individual case, "but that it has to do with family. If [defendant] came from a good family, then, in [Juror No. 5's] words, he would 'burn him.' But he came from a bad family. . . . [B]ecause [defendant] came from a bad family, he could not [vote for the death penalty]." Juror No. 6 initially thought this was a race-based opinion, but by the second day, although race might have been a consideration, "I really think, by his [own] admission, that it would not matter if it was a white person sitting there, a hispanic, or, you know, whatever; that what he looked at was family only, period, end of discussion, end of thought." She affirmed that Juror No. 5 had said that race did not matter.

Juror No. 11 told the court that Juror No. 5 did not say, "Who are we to say what's worse?," but agreed he had said defendant should sit in jail for the rest of his life and think about his crime. Juror No. 7 told the court that Juror No. 5 had made such comments, but was speaking of his own personal opinion and not necessarily the state of the law.

Addressing the same issue, Juror No. 10 said: "What was going on in there was that, the deliberations—he felt that because of the background that was put forward on the abuse during his childhood, that there was—he said, 'It's not an excuse,' but he said, 'it's a reason why I won't give the death penalty.' So I think in his mind he does believe that the death penalty is the worse penalty, okay."

Juror No. 9 reported that Juror No. 5 had never said he believed life was a more severe penalty than death.

Juror No. 5 himself denied saying he thought life was a more severe penalty than death and explained the context of the discussion: "I think my statement was . . . relative to what was told to me [by the other jurors], they said, 'Well, you're letting him get away,' [and] I say, 'Do you call life in prison getting away?' " Asked whether he understood the law that "death is considered to be the worse of the two penalties," he answered that he understood. Asked whether he was applying that law, he answered in the affirmative.

The trial court initially stated it found Juror No. 5 credible on this point: "With respect to the statements that he denied saying about life without possibility of parole, *I'm satisfied that he understands and can follow an instruction that death is worse.* In the context of the statements he's alleged to have made, I think he probably did make those statements. I don't believe he thinks that at this point, based on his statements and all the other evidence I've heard, or that he's unable to follow that kind of an instruction." (Italics added.) Later, when explaining its decision to remove Juror No. 5, the court inexplicably stated it found that he had committed misconduct by failing to follow the instruction that death was the more severe penalty.

### b. *Discussion*

 The jury was instructed to return a verdict of death if it found the evidence in aggravation was so substantial in comparison to that in mitigation that defendant warranted the death penalty instead of life in prison. We presume the jury followed this instruction. (*People v. Gray, supra,* 37 Cal.4th at p. 231.) A juror's failure to do so is misconduct, and "[i]n appropriate circumstances a trial judge may conclude, based on a juror's willful failure to

follow an instruction, that the juror will not follow other instructions and is therefore unable to perform his or her duty as a juror." (*People v. Ledesma* (2006) 39 Cal.4th 641, 738 [47 Cal.Rptr.3d 326, 140 P.3d 657].) Did Juror No. 5 fail to follow the instruction that death was a more severe penalty than life in prison?

In evaluating the testimony of the 12 jurors, the trial court necessarily had to assess their credibility. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 78 [17 Cal.Rptr.3d 710, 96 P.3d 30] [because the trial court can observe the demeanor of a witness, it is in the best position to assess credibility].) In doing so, the court expressly found Juror No. 1, who opined that Juror No. 5 had stated that life was a more severe penalty than death, generally credible. A few jurors also heard Juror No. 5 say that defendant should sit in jail for the rest of his life and think about his crimes because that would be the more severe penalty, but some did not. Others presented a more nuanced explanation. In any event, even assuming Juror No. 5 made the disputed comment, its mere utterance was insufficient to satisfy the "more stringent demonstrable reality standard [that] is to be applied in review of juror removal cases." (*People v. Barnwell, supra,* 41 Cal.4th at p. 1052.) This much is clear when we consider four factors: First, the trial court did not expressly find that Juror No. 5 was prevaricating when he explained the context of his statement and affirmed that he understood death was worse than life and that he was applying that rule. Although the trial court noted that Juror No. 5's demeanor during pretrial voir dire suggested he was less than truthful at that time, the court made no such finding with regard to whether Juror No. 5 was credible when questioned during the penalty phase deliberations following Juror No. 1's complaint. The record of that inquiry suggests Juror No. 5 was completely honest, open and straightforward in his responses to the court's questions.

Second, when explaining its ruling, the trial court stated initially that it was "satisfied that [Juror No. 5] understands and can follow an instruction that death is worse." Later in its explanation, the court contradicted itself. The court did not explain this inconsistency, which tends to undermine the validity of the court's ruling on this point.

Third, Juror No. 5 was one of the 10 jurors who initially voted for the death penalty. It was only when the two jurors holding out for life changed their minds that Juror No. 5 informed the jury that he too had changed his vote. This latter fact is undisputed and, contrary to the implication raised by Juror No. 1's complaint, belies the suggestion that Juror No. 5 was not following the instruction that death was the more severe penalty.

Finally, Juror No. 5 suggested that had defendant been raised in a supportive, intact family, he would consider death as a possible penalty.[17] The trial court did not indicate it believed Juror No. 5 was less than truthful in making this assertion. This expressed view demonstrates clearly that Juror No. 5 understood which penalty the law considers the more severe.

After considering these factors, we conclude that to the extent the trial court excused Juror No. 5 on the ground that he was not following the instruction to consider death a more severe penalty than life imprisonment, the court erred because the record does not establish *to a demonstrable reality* that he was failing to follow the instruction.

### 7. *Prejudging the Appropriate Penalty*

The fourth and final ground the trial court cited in support of its decision to remove Juror No. 5 was that he had commented on the question of penalty with Juror No. 1 during the guilt phase and had thereby prejudged the penalty. As with the other three alleged grounds for excusing the juror, we conclude the record does not establish to a demonstrable reality that Juror No. 5 had prejudged the issue of penalty.

#### a. *Facts*

The only evidence Juror No. 5 had prejudged the issue of penalty came from Juror No. 1, who informed the court that during a break in the guilt phase proceedings, between the testimony of Michael Durbin and L.R., Juror No. 5 told him: "The whole thing is a problem with authority, and this is what happens when you have no authority figure." According to Juror No. 1, Juror No. 5 made such comments on one or two occasions. Juror No. 1 said he thought nothing of the comments until the jury began deliberating penalty, that he did not respond to the comments, did not know if other jurors had overheard them, and did not know if Juror No. 5 made the same comment to other jurors. He recalled the comments when Juror No. 5 repeated them during the penalty phase deliberations.

None of the other jurors heard Juror No. 5 make these comments, either outside the courtroom, outside the jury room or during the guilt phase deliberations.

---

[17] Indeed, Juror No. 6 recalled that Juror No. 5 had said that if defendant came from a good family, "he would 'burn him.' " Significantly, Juror No. 1, in his note to the trial court, used the same colorful turn of phrase when reporting Juror No. 5's statements (" 'If this guy came from a good family + had a college ed[ucation] then I'd say "burn him" ' "), giving added support to the notion that Juror No. 5 understood that death was the more severe penalty.

Several jurors, however, recalled Juror No. 5's discussing during penalty phase deliberations the absence in defendant's life of a role model and a traditional father/son relationship. For example, Juror No. 6 reported that on the second day of penalty phase deliberations, Juror No. 5 informed the jury that "it didn't matter what [defendant] had done or who he was; that he could not [vote for] the death penalty if he came from a bad family." Juror No. 6 believed that Juror No. 5 had made up his mind at the outset of the penalty phase deliberations, but then retracted that statement, explaining that on the first day, Juror No. 5 had said nothing to suggest prejudgment and only discussed his experiences as an African-American man growing up and the importance of having a good family.

During the trial court's examination of Juror No. 5 in the middle of penalty phase deliberations, the following colloquy occurred:

"THE COURT: . . . [¶] Did you say to another juror on your way out of the courtroom after Michael Durbin, or perhaps even during his testimony, but sometime in that time frame, 'How can you hold someone responsible for their actions?'

"JUROR No. 5: I don't recall that, no.

"THE COURT: Okay. Does it sound like something you could have said?

"JUROR No. 5: I don't think so.

"THE COURT: 'No'? Okay.

"Did you also comment on the lack of an authority figure and say, 'This is what you expect when you have no authority figure, this type of behavior,' way back at that stage?

"JUROR No. 5: I may have.

"THE COURT: You may have?

"JUROR No. 5: Yes.

"THE COURT: All right. That's something you can see yourself saying back at that stage?

"JUROR No. 5: Sure.

"THE COURT: All right. But you don't recall specifically who you might have said it to or what exactly you said?

"JUROR No. 5: No. No, no."

Although none of the other jurors heard the alleged out-of-court comments, and Juror No. 5 himself expressly denied any mention of not holding defendant responsible, the trial court credited Juror No. 1's account, concluding, "there is no doubt in my mind that between the first and second witnesses in the guilt phase, . . . that on the way out of the courtroom, and apparently unheard by other jurors, he made those comments. So that is my factual finding on that issue." The court later held that "by attempting to communicate with [Juror No. 1] after the first guilt phase witness, . . . I find that he began to reveal his fundamental biases and prejudices, because I find that he made unfounded assumptions about the defendant and authority figures when at that time he had absolutely no evidence of such. He—as I said before, he didn't even have the benefit of the defense's opening statement in which they referenced such things. [¶] He then repeated those phrases, or something similar, in the penalty phase deliberations, which indicates that he was just carrying through his prejudgment of whatever he was going to do in the penalty phase."

### b. *Discussion*

 Jurors are prohibited by law from discussing the case until all the evidence has been presented, the trial court instructs the jury, and the jury has retired to deliberate. Section 1122, subdivision (a) provides in pertinent part that "[a]fter the jury has been sworn and before the people's opening address, the court shall instruct the jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, admonitions that the jurors shall not converse among themselves, or with anyone else, on any subject connected with the trial . . . ." Defendant's jury was so instructed.[18] (See CALJIC No. 0.50 [pretrial admonition]; CALCRIM No. 101 [same].) Violation of this duty, in the form of discussing the case with a *nonjuror*, is serious misconduct. (*In re Hitchings, supra*, 6 Cal.4th at p. 118.)

---

[18] Before presentation of the first witness at the guilt phase, the jury was instructed: "You must not converse among yourselves or with anyone else on any subject connected with the trial except when all the following conditions exist: First, the case has been submitted to you for your decision by the Court following arguments by counsel and jury instructions; second, you're discussing the case with a fellow juror; and third, all 12 jurors, and no other persons, are present in the jury deliberating room."

The issue sometimes arises after a verdict has been rendered, when a criminal defendant attempts to undermine the validity of the verdict by claiming a juror violated the court's admonition not to speak to anyone connected with the case. In such circumstances, we have held that trivial violations of this rule do not require reversal because no prejudice to the defendant resulted. For example, in *Stewart, supra,* 33 Cal.4th 425, a sitting juror approached the defendant's girlfriend during a break in the trial and told her she was a very attractive woman. (*Id.* at p. 509.) We affirmed the trial court's conclusion that the misconduct was of a " 'trifling nature' " and did not warrant a new trial. (*Id.* at p. 510.)

The issue also arises before a verdict has been returned, when one party, as here, argues a juror should be removed for violating the court's admonition. In such circumstances, the same rule applies: Trivial violations that do not prejudice the parties do not require removal of a sitting juror. For example, in *People v. Loot* (1998) 63 Cal.App.4th 694 [74 Cal.Rptr.2d 324], a sitting juror encountered a deputy public defender in an elevator during a break in the trial. The juror asked her whether the prosecutor was "available," that is, whether the juror could see the prosecutor socially. The appellate court agreed with the trial court that this brief conversation was a technical breach and constituted juror misconduct, but that it did not establish as a demonstrable reality that the juror was unable to perform her duty as a juror, and that any presumption of prejudice was rebutted. (*Id.* at p. 698.) "Among the factors to be considered when determining whether the presumption of prejudice has been rebutted are '*the nature and seriousness of the misconduct,* and the probability that actual prejudice may have ensued.' " (*Ibid.,* italics added.) While the juror's questions were "a technical violation of Penal Code section 1122, they were certainly not as serious as questions designed to obtain extrinsic evidence regarding the case itself. [Citation.] We see little possibility actual prejudice may have ensued. All 12 jurors voted defendant guilty. There is no evidence to suggest [the offending juror] would have been the lone holdout for acquittal but for her possible amorous interest in the prosecutor or that based solely on the prosecutor's attractiveness she was able to sway the other 11 jurors to a guilty verdict on each count. On the other hand, there is unrefuted evidence the juror did not discuss the incident on the elevator with the other jurors and her interest in [the prosecutor] did not affect her deliberations." (*Ibid.*)

As were the comments to a nonjuror in *People v. Loot, supra,* 63 Cal.App.4th 694, Juror No. 5's solitary and fleeting comments to a fellow juror, made during a break early in the guilt phase portion of the trial, were a technical violation of both section 1122 and the court's admonition to the jury not to discuss the case. But the violation was a trivial one: one, possibly two

sentences, spoken in rhetorical fashion and not in an obvious attempt to persuade anyone. Juror No. 1 averred that he did not respond, and none of the other jurors reported hearing the comments. "No trials are perfect—evidentiary or procedural errors are bound to occur" (*People v. Garcia* (2005) 36 Cal.4th 777, 808 [31 Cal.Rptr.3d 541, 115 P.3d 1191] (conc. & dis. opn. of Chin, J.)), and while jurors are told not to discuss the case until all the evidence has been presented and instructions given, they are not precluded from thinking about the case, nor would that be humanly possible. The situation in this case is even less serious than in *Loot*, for Juror No. 5 made his comments to another *juror*, not a witness, a party, an attorney or some other nonjuror.

In any event, even deferring as we do to the trial court's factual conclusion that Juror No. 5 actually made the challenged comments at a break in the guilt phase proceedings, its further conclusion the comments demonstrated Juror No. 5's *prejudgment* of the penalty issue cannot withstand scrutiny. While we rely on our trial courts to assess a juror's state of mind in such circumstances, we have explained that such decisions are not subject to the substantial deference afforded other factual decisions. Instead, a court's decision to remove a juror must be supported by evidence showing *to a demonstrable reality* that the juror is unable to perform the duties of a juror. (*People v. Barnwell, supra,* 41 Cal.4th at p. 1052.) This is a "heightened standard" (*ibid.*) and requires a "stronger evidentiary showing than mere substantial evidence" (*People v. Cleveland, supra,* 25 Cal.4th at p. 488 (conc. opn. of Werdegar, J.)).

We conclude the evidence does not establish to a demonstrable reality that Juror No. 5 prejudged the question of penalty. That Juror No. 5 voted with the other 11 jurors to reach a unanimous guilt phase verdict, convicting defendant of murdering and torturing Uwe Durbin is undisputed. This fact of itself is inconsistent with the trial court's conclusion that Juror No. 5 harbored "fundamental biases and prejudices" and "unfounded assumptions about the defendant and authority figures," to wit, that those who are raised without stable families and proper role models cannot be blamed for their antisocial behavior.

Thereafter, at the beginning of the penalty phase deliberations, Juror No. 5 joined nine other jurors in a tentative, initial vote to impose the death penalty. Only four days later, *after* the two holdout jurors changed their minds, did he too change his mind and vote for life. These facts further indicate that Juror No. 5, when he uttered the challenged comments during a break in the guilt phase proceedings, had not firmly prejudged the case, that the issue was fluid in his mind, and that he was open to imposing the death penalty on defendant. It merely appears that, during the guilt phase, Juror No. 5 was

entertaining various concerns about the case in his mind and improperly blurted out one of his thoughts at an inappropriate moment. Contrary to the trial court's ruling, such thoughts did not show Juror No. 5 had prejudged the case, for he voted to convict and initially voted for the death penalty.

Under such circumstances, we cannot conclude the mere utterance of one or two short sentences establishes *to a demonstrable reality* that Juror No. 5 had prejudged the question of penalty. To the extent the trial court ruled otherwise in removing him from the jury in the middle of penalty phase deliberations, it erred.

 In sum, the trial court cited four grounds for removing Juror No. 5: that he concealed bias on voir dire, that he relied on facts not in evidence when deliberating the penalty question, that he refused to follow the instruction that death was a more severe penalty than life in prison, and that he prejudged the question of penalty. Finding none of these grounds have been established to a demonstrable reality (*People v. Barnwell, supra*, 41 Cal.4th at p. 1052), we have no choice but to reverse the penalty verdict.[19]

B. *Effect of Discharge on the Guilt Phase*

Defendant finally contends that to the extent Juror No. 5 is found to have been biased based on his comments outside the courtroom during the guilt phase, we must reverse the guilt judgment. In support, he argues that if there was a "substantial likelihood" the juror was biased, the guilt phase verdict is tainted "no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard." (*People v. Nesler, supra*, 16 Cal.4th at pp. 578–579.) Respondent replies that, if anything, Juror No. 5 was biased in defendant's favor and thus the rule requiring automatic reversal is not required.

Because we find that Juror No. 5's fleeting and solitary comments do not establish to a demonstrable reality that he had prejudged the case, we also conclude there was insubstantial evidence indicating that he was a biased juror. Indeed, he affirmed he could follow the law and that he in fact was following the law. His fellow jurors reported that he was an active participant in deliberations. Accordingly, we conclude he was not a biased juror and thus reject defendant's argument that we must reverse the guilt phase judgment.

---

[19] Our conclusion makes it unnecessary to consider defendant's further contention that the trial court thereafter erred by removing the first alternate juror assigned to replace Juror No. 5.

## VI. Conclusion

The judgment of guilt is affirmed. Because the trial court improperly discharged Juror No. 5 during penalty phase deliberations, we reverse the penalty phase judgment.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.